## MORGAN CONST. CO. v. WELLMAN–SEAV-ER–MORGAN CO.

(Circuit Court of Appeals, Sixth Circuit. March 28, 1927.)

Nos. 4450, 4453, 4454.

1. Patents ⬉328—1,178,086, claims 10–14, for fuel feeder for gas producers, held not infringed.

Lummis patent, No. 1,178,086, claims 10–14, for fuel feeder for gas producers, held not infringed.

2. Patents ⬉328—1,274,176, for fuel feeder for gas producers, held infringed as to claims 5 and 6, and not infringed as to claims 4, 10, 21.

Lummis patent, No. 1,274,176, for fuel-feeding mechanism for gas producers, held infringed as to claims 5 and 6 and not infringed as to claims 4, 10, 21.

3. Patents ⬉328—977,651, for supplying air blasts to, and removing ashes from, gas producers, held not infringed as to claims 4 and 5 and infringed as to claims 1 and 2.

Hughes patent, No. 977,651, relating to means for, or used in connection with, supplying air blasts to, or removing ashes from, the bottom of gas producers, held not infringed as to claims 4 and 5, and infringed as to claims 1 and 2.

4. Patents ⬉328—1,255,015, for supplying air blasts to and removing ashes from gas producers, held infringed.

Jefferies patent, No. 1,255,015, relating to means for, or used in connection with, supplying

plying air blasts to, and removing ashes from, bottom of gas producers, held infringed.

5. Patents ⬉328—913,551, claims 1, 2, 3, 6, for supplying air blasts to, and removing ashes from, gas producers, held not infringed.

Waldburger patent, No. 913,551, claims 1, 2, 3, 6, relating to means for, or used in connection with, supplying air blasts to, and removing ashes from, the bottom of gas producers, held not infringed.

Donahue, Circuit Judge, dissenting in part.

Appeals from the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Patent infringement suit by the Morgan Construction Company against the Wellman-Seaver-Morgan Company. From a decree denying relief to plaintiff on its claims and to defendant on its counterclaims, both parties appeal. Reversed and remanded, with directions.

Frederick P. Fish, of Boston, Mass. (J. Lewis Stackpole, of Boston, Mass., and George H. Kennedy, Jr., of Worcester, Mass., on the briefs), for Morgan Co.

A. J. Hudson, of Cleveland, Ohio (Kwis, Hudson & Kent, of Cleveland, Ohio, and Melville Church, of Washington, D. C., on the briefs), for Wellman-Seaver-Morgan Co.

Before DENISON, DONAHUE, and MOORMAN, Circuit Judges.

DENISON, Circuit Judge. The Morgan Company and the Wellman-Seaver-Morgan Company are long-time competitors in the business of making and selling gas producers. These are coal-burning furnaces or retorts of generally cylindrical shape, 10 or 12 feet in diameter, and (with attachments) 15 or 20 feet high, weighing many tons, and costing several thousands of dollars each. There is a continued day and night operation, by which coal is fed into the top, and air under pressure into the bottom, ashes removed from the bottom, and gas produced and carried away for use or storage. In these various appeals five patents are involved.

The Morgan Company (hereinafter for convenience called "Morgan") sues the Wellman-Seaver-Morgan Co. (hereinafter called "Wellman") upon claims 10 to 14 of Lummis patent, No. 1,178,086, filed in May, 1914, granted April 4, 1916, on a "gas producer," and upon claims 4, 5, 6, 10, and 21 of Lummis patent, No. 1,274,176, applied for in June, 1915, issued July 30, 1918, for "feeding mechanism for gas producers." Both of these patents have to do with a device for

automatically feeding coal into the top of the producer. Morgan also sues Wellman upon Jefferies patent, No. 1,255,015, issued January 29, 1919, upon an application filed in December, 1914, relating to "gas producers," alleging infringement of all ten claims of this patent. Wellman counterclaims by alleging infringement of two patents which he owns. He claims infringement of claims 1, 2, 4, and 5, of the patent to Hughes, No. 977,651, issued December 6, 1910, upon an application filed in June, 1910, for a gas producer, and of claims 1, 2, 3, and 6, of patent No. 913,551, issued to Waldburger, February 23, 1909, upon an application made in May, 1908. The Jefferies, Hughes, and Waldburger patents relate to means for or used in connection with supplying air blasts to and removing ashes from the bottom of the producer.

The district court denied relief to either party upon any claim, holding all of the claims in suit to be either invalid or not infringed.

[1] *Lummis Patent, No. 1,178,086.*—Since there is a constant production of gas accumulating in the upper part of the producer, and under pressure, there are obviously some difficulties in feeding coal automatically and continuously into this chamber, and not allowing the gas to escape. One difficulty is that any feeding device moving in a body of coal will frequently catch lumps of coal or slate between its advancing edge and some other part of the device with which it makes a shearing contact, and thereupon the mechanism will be stopped, unless the device is given sufficient power and strength to crush the obstacle. Either alternative makes the device commercially unsuccessful. This trouble is of especial importance in gas producers, because there must be constantly a gas-tight joint in connection with the incoming coal, and hence the pocket or the receptacle by which coal is carried into and deposited in the upper chamber must not permit the coal to lodge between its edge and the corresponding sealing edge, and also because there should be no interruption of continuity.

Lummis, in his first patent, disclosed the idea of using between the bottom of the coal hopper and the producer chamber two successive and independent carriers; the first was smaller than the second. He filled the first from his coal hopper and moved it over and dropped it into the second. On account of the difference in size, the second could not possibly be filled up to its upper edge. He then drew the second over the opening and dropped its contents into the gas-producing chamber. Since it was not full, there could be no lodging of coal caught by its upper edges. These two receptacles were moved horizontally and in longitudinal reciprocation. Lummis' claim 10, which is typical of those in suit, reads:

"In a fuel feeder for gas producers, a member having a pocket, means for feeding a predetermined charge of fuel, less than the capacity of said pocket, to said pocket at predetermined intervals, and means for discharging said pocket between said intervals."

In his second patent, which alone is superficially similar to the Morgan commercial device, he develops the same idea of a nonfillable pocket as applied to a continuously rotating, instead of a longitudinally reciprocating feeding pocket. His feeding device may be generally described as a cylindrical, hollow, horizontal, rotary valve, interposed between an upper coal supply and the lower producer chamber. The outer hollow wall is entirely cut away for its whole length and for a width of about one-sixth of the circumference. Thus the interior becomes a pocket with an opening. When the opening is on top, coal will fall into the pocket; as the valve is rotated this entry of coal will be stopped, and when the opening reaches the bottom the contents will be dumped on the fire. In the Morgan commercial form there are a longitudinal central partition in the valve and two openings, one into each of the chambers, thereby causing the general form as shown in the following cut:

The general form of the corresponding parts of the Wellman producer is as shown below.

In this Wellman feeder the upper rotating device is at the bottom of the hopper coal column and turns anticlockwise. It consists of a shaft, to which are attached four right-angled vanes, and the outer edge of each vane carries a fin, preventing the coal from at first falling off the edge. It is apparent that at a certain point of the revolution the coal will begin to fall over the fin, that the remainder will be somewhat gradually emptied out, and that coal from the vane above will begin falling at about the time the vane below is emptied, even if they do not overlap. Hence it is evident that the coal will fall in approximately a continuous shower, and by the lower device will be divided into successive charges, which are separately carried around and deposited.

We find it unnecessary to consider Wellman's contention that the claims in suit of the first Lummis patent are invalid, or. should be confined to a reciprocating device. For the purpose of the opinion, we assume that Lummis was the first to adopt and apply the idea that the producer feeding pocket in an automatic device could be automatically prevented from completely filling, and, also assume that for such a pocket to travel between filling and discharge points in a rotary path is equivalent to traveling in longitudinal reciprocation. Even when making those assumptions, we are convinced that the first Lummis patent naturally contemplates,

and is confined to, a device having two separate measuring and feeding pockets, the first one of which measures off and segregates a charge of coal, and then carries it over, in its segregated and independent condition, for deposit in the second or final feeding pocket, thereby and because of its segregation of a small charge insuring that the second pocket cannot be completely filled.

The Wellman feeder does not respond to this conception. His upper feeding device is essentially an overshot wheel, located in the coal stream, and regulating the speed of the stream flow. It is true there is a period during which each vane, with its fin, segregates a body of the coal and carries it along, but the body so segregated and carried does not preserve its integrity except momentarily, and not for the purpose of deposit in the lower pocket. The coal carried by one vane may all drop into one pocket, but probably it will not. Since the upper feeder has four compartments and the lower five, it would be impossible to preserve the integrity of the coal charges unless the upper device were geared to a speed 20 per cent. higher than the lower. We find no suggestion that this is done or has been thought of. Hence we are satisfied that there is no infringement of the claims of this patent sued upon.

[2] *Lummis Patent, No. 1,274,176.*—Of the first group (5 and 6) of the claims sued upon in the second Lummis patent, claim 5 is typical. It is this:

"In a fuel-feeding mechanism for gas producers, a rotatable charging member having an opening, and supporting means for said member providing a concave seat having a passage to the producer chamber for registration with said opening, and means for segregating a charge of fuel in said member of such a size as to prevent the lodgment of fuel between the edge of said seat and the rear edge of said opening in the rotation of said member."

It is quite apparent that the Wellman feeder responds to the terms of this claim, if broadly read, and that the questions must be as to the validity of the claim and as to the extent of its restriction to "means." The fundamental idea plainly is that the charging pocket must be so far from completely filled that the contained coal will not touch the meeting point between the advancing rear edge of the pocket and the surrounding structure. In all regulatable feeding devices (including the man with the shovel) this result can be accomplished by feeding the coal at such a rate, and rotating the pocket at such a relative rate, that there will not be time for it to fill while it passes by. This method of regulation depends for its effi-

ciency upon perfection in operation, and obviously is likely to fail occasionally. An occasional failure in this connection is serious, because, if the pocket does get too full, and the device thereby clogs, or breaks, the desired continuous gas production stops. The other method of preventing complete filling is to provide mechanical construction and arrangement by which the pocket cannot fill, no matter how much coal is fed to it. Lummis depended upon this method. His receiving pocket, instead of being wide open, as a rectangular one or one sector shaped in cross-section would be, had a restricted opening, so that a portion of its interior was protected from the falling coal, and never could fill. Even if it might stand still under the stream of flowing coal, the angle of repose of the coal which entered the pocket through the restricted opening would be such that the pocket could not fill. The portions of his cylinder wall, which were in contact with the coal stream at any time while the opening was exposed, constituted flanges or fins covering part of the opening, and insuring that, as the rotation continued, there would be an interior vacant space into which the contained coal could fall away from the rigid rear edge which was advancing through the coal, so that, at the moment of its contact, with the other rigid edge there would be a vacant space below them. This was the embodiment of his conception that he could automatically prohibit overfilling in a rotary feeder. It is true he had only one pocket in his rotating and charging member, but neither the inventive conception nor the language of the claim limited him to such a form. Commercially Morgan uses two chambers; Wellman uses five. Of course, if Wellman uses five openings in his charging member he seems to infringe the claim which calls for "a charging member · having an opening"; having employed an opening, he does not avoid infringement by employing more than one. The essential thing is that the opening should not be for so great a part of the circumference as to interfere with the automatic prevention of too complete filling or with effective filling. Lummis says that the opening should not be more than one-sixth of the circumference; and Wellman is within this restriction.

In so far as claim five calls for "means," it should either be extended rather liberally to reach equivalents, or be restricted in its equivalency range, according to the status which the patent has in this particular development. The particular "means" upon which Lummis relies for his result, and which he expressly describes as producing the result, are two: The first is that the pocket

have the "restricted opening" and ·thus be protected by the cylindrical fin so that it cannot fill; the second is that the coal be fed at one side of the vertical plane of the axis of the charging member, so that there will be less opportunity for the coal to roll in and fill the space under this fin as the lower member rotates than there would be if the coal came down on the center line. In other words, by this side feeding, the cutting off takes earlier effect. It is not necessary to consider whether either of these specific means might be absent; Wellman uses them both, and we see no reasonable theory of giving even a · fairly restricted scope to "means" in the claim which will not at the same time include the Wellman form. Wellman insists that the anti-filling "means" which Lummis contemplated included the unobstructed flow of the coal from the chute into the pocket until it ceased because the angle of repose had been reached in the continuous slope of the coal in the chute and in the pocket. We do not so construe Lummis's statement. Taken all together, the language used refers, we think, to the angle of repose of the coal which has passed into the pocket, because it is only that angle which has due relation to the nonfillable characteristic.

The only remaining question must be whether the state of the art forbids us to find invention in the means, or combination of means, just referred to. Feeding from one side of the center line was old; the combination of such feeding and the rotary charging member, with a thus restricted entrance, is nowhere found; and we may pass by the question whether invention might rest upon the novelty of that combination if both elements were old, for we do not find in the earlier art the equivalent of Lummis' fin-restricted rotary charging member; he had the first rotary feeder with nonfillable pockets ever built.

Wellman relies upon several older patents in this respect, the closest of which are Hughes, Wiborgh, Dango, and Lochomette. We think it apparent that no anticipation or limitation of Lummis' invention is to be found in any of those numerous devices, which prevented the complete filling of the pocket only by not feeding to it enough coal. Such devices are not within either the conception or the formulation of his invention; and all four of these closest earlier devices are substantially, if not wholly, of the class which should be thus excluded from consideration.

In Hughes (No. 904,873—November 24, 1908) the charging member had three pock-

ets opening through the cylindrical shell for the full length and width of the pocket. There was nothing resembling the fin portion of the cylindrical wall extending and projecting over the pocket to keep coal out of it; nor was there any equivalent pocket protection; there was no "restricted opening." His pocket plainly might fill completely. Of course it might not; but, if not, it would be because the upper feeding device had slowed down sufficiently.

Wiborgh (Swedish patent—March 28, 1900) has a suggestion of the cylindrical fin, but only a suggestion. The radial blades of the charging member are turned over into a slight flange, that obstructs not over 10 or 15 per cent. of the width of the pocket at its circumference; while Wellman's projecting fin is about twice as great. Apparently one would be operative, and the other would not be; but, even if Wiborgh might be thought to indicate this protecting fin, his disclosure of the invention would only be accidental and unintelligent, and thus not sufficient. Eibel Co. v. Paper Co., 261 U. S. 45, 66, 43 S. Ct. 322, 67 L. Ed. 523. Wiborgh's specification shows that, though he did understand the necessity of keeping the shearing edge of the pocket free from coal that might block it, he had no notion that this so-called fin would be useful in this respect. He shows the fin in his drawing, but makes no reference to it in his specification. On the contrary, he provides an elaborate scraping device which, as the pocket advances, will move across it and scrape away the surplus coal so that there may be no clogging or shearing.

Dango (French patent—1902) represents a rotary charging device, the pockets of which are to be filled by a man with a shovel. There is no cylindrical fin nor any restricted opening, fairly to be so considered. The opposite portions of the side walls of the pocket tend toward each other, but they are substantially parallel, and the slight convergence would not at all interfere with complete filling. In this device there were no such problems to be met, because there was no surrounding shell, and as the member revolved the surplus coal would fall off outside.

Lochomette (Swiss patent—1908) was an intermittent discharge for the coke accumulating at the bottom of a coke retort. The final discharge member (which he calls his "drum") bears a general resemblance in form and function to Lummis' patented form of rotary feeder, but, if he accomplished at all Lummis' characteristic result, he did so by accident. The opening in the wall of his drum is the full width of the conduit leading

to it, so that it cannot be called a restricted opening. If the drum were rotated fast enough, there would not be time for it to fill, and in this sense only is it nonfillable. Lochomette says nothing about preventing the drum from filling. He says it may be rotated or oscillated. If oscillated, it would naturally stand still under the conduit, and it would be filled and more than filled. He realized that there might be trouble from a shearing or crushing of the coke, but says that this would not be serious because the coke is so light that the impeding column would be pushed up out of the way. Very clearly the conception of Lummis' invention had not occurred to him; he did not understand or disclose the Lummis theory of operation; and he showed only, in some of the figures of his drawings, a construction which would develop this principle if provided with certain materials and used in a certain way, which he did not mention. Under the familiar rules which limit the disclosure of a foreign patent pretty closely to what is shown and described, and considering that Lochomette is for dropping coke from the bottom of a retort, where continuous or regular automatic action is of no importance, it does not seem sufficient to invalidate claim 5, with the scope we have indicated.

The result is that claim 5 and claim 6 must be sustained and held infringed.

Claims 4, 10, and 21 of this same patent had to do with the seat for this revolving drum or feeding member. They embody the thought that this seat or cradle should be limited to less than half of a circle in its vertical cross-section form. It is so obvious that, if any kind of a journal or horizontal revolving cylindrical member must be liftable out of its seat for some purposes, and that hence, unless there is a removable upper bearing, the lower one must be of not more than 180°, that there seems scant room for invention in applying this thought to a device of this kind. Without going into details, we are satisfied that these claims cannot be made to cover Wellman's considerably variant form without giving them a scope which would make them invalid.

In considering the validity and scope of the second Lummis patent, it is not without importance to observe that prior to 1908 gas producers marketed by both parties had been fed by manual operation,—not automatically; that in 1908 Wellman had devised a patented automatic feeder (Hughes, No. 904,873), and, although one had been built in 1909, it was not then put on the market, ob-

viously was not satisfactory, and both parties continued hand feeding;[3] that in 1914 Morgan put on the market his automatic feeder which we think embodied the second Lummis patent as its chief feature of novel value; that this seemed satisfactory to the trade and was sold for some years in considerable numbers, while Wellman continued to sell the hand-operated devices until 1916. He then built a few of this Hughes type, but in 1919 abandoned that and substituted his present feeder, modifying therefor his unsuccessful 1908 apparatus far enough to carry into it one of the essential principles of his competitor's successful device.

Coming to the lower part of the producer: In order to get continuous effective operation, the ash bed must be constantly and evenly settling, without interfering with the regular upward passage of the air blast through the fuel bed. In some instances the ash pan was stationary, while the fuel bed and its containing shell revolved. This produced a shearing action between the fuel bed and the ash bed, tending towards irregularity in the settling. Others had integral connection between shell and ash pan, both revolving together. In some cases the central, upwardly projecting blast apparatus revolved with the ash bed; sometimes it was stationary. There must be at the bottom such a complete closure that gas could not escape, but the ashes must be freely removable.

Prior to 1908 the most common form, exemplified by the Wellman "standard," had a unitary shell and ash pan, the ash pan being supported on rollers, and in turn supporting the shell through peripheral posts extending up from the ash pan in sufficient number to carry the lower end of the shell. The pan was externally extended up and above the bottom of the ash shell like a saucer, so that the ashes must go down under the edge of the shell and up and over the edge of the ash pan. This was filled with water, giving a desirable means for cooling and handling the ashes, and also making a water seal. The ashes were removed by hand, shoveling from the edge of the pan, as it rotated. In regular operation this would require a hand removal of perhaps three

tons per day. It was called the "wet ash" producer.

About 1910 Hughes, associated with Wellman, devised an improved plan for automatic ash removal. He made his ash pan smaller and flatter, and suspended it by a central support from the spider reaching in from the lower edge of the ash shell. Thus the entire revolving ash pan, from the central support to the outer edge, was open and free, and a suitable stationary part inserted at intervals would act as a plow to carry the ashes over the ash pan edge. They then fell into a hopper, and this hopper shell extended up and around, and was attached by gas-tight joint to the shell above the ash pan. The bottom of the hopper could be temporarily opened to discharge the ashes. With this device water could not be used, and there were certain practical disadvantages making its net utility, as compared with the old form, more or less doubtful. Wellman put the new form on the market, calling it his "dry ash" gas producer, and continued the old form as the "standard" wet ash producer.

In 1914 Morgan put on the market a wet ash producer, so constructed that a plow could be used automatically to remove the ashes. In 1919 Wellman adopted substantially this new Morgan form, discontinued his standard wet ash producer, and made thereafter very few of the dry ash form. Practically speaking, the wet ash form first marketed by Morgan, and later adopted by Wellman, has superseded the others in commercial use.

[3] The Hughes patent in suit discloses his third producer of the "dry ash" form. Claims 4 and 5 pertain primarily to the air blast function. Claim 4 is "in a gas producer, a revoluble body, arms carried by said body and blast mechanism supported by said arms." Hughes' earlier patents, upon applications filed in 1905 and 1908, disclose everything involved in the blast apparatus of the patent in suit, excepting that in both the earlier patents, the ash table base might or might not revolve with the revolving body, through the effect of the friction between the fuel bed and the ash bed. Whether it did or did not so revolve, there might be more or less shearing action between the ashes and the blast apparatus projecting up into it. The novelty in these two claims, as compared with these older patents, lies in the fact that the central blast apparatus is rigidly connected to both body and ash table, so that all three must revolve together and there can be no such shearing. It is obvious that the claim phrase "carried by" may have reference to the weight-supporting function

---

[3] On the hearing Wellman presented a reproduction of this Hughes structure which he had built in 1909 and laid aside five years before Morgan; it worked, but lamely, as seemingly was inevitable. Wellman now justifies his present form by claiming full-blood descent from Hughes. We cannot doubt some mixture of Lummis ancestry.

or may refer only to the connection between two parts, each of which is carried by the other when the latter is somehow driven. Restricting the phrase to the latter meaning, as must be done when we come to the matter of infringement, we find that in the other form, the wet ash producer, the same result had been reached by connecting the body rigidly to the ash pan, and the latter rigidly to the central blast box so that all three must revolve together. In this patent Hughes made the connection more directly, by using arms to bridge the gap between the shell and the blast box. So far as concerns the relation between the blast box and the ash bed, he had no new result; and his substitution of horizontal arms for vertical arms, considering only their connecting function, seems to us not to involve invention. In so far as the phrase "carried by" might mean "suspended from," or "having its weight supported by," there would be a different kind of novelty, which is not now involved, and we therefore prefer to say that claims 4 and 5 are not infringed.

Claims 1 and 2 are directed to a different conception. Claim 2 is "in a gas producer, a revoluble body having an ash hopper, an ash table carried by said body beneath said hopper, and a stirring device disposed between said hopper and table." Here again it is insisted that "carried by" means "having its weight supported by"; and it is clear that with that interpretation there is no infringement. We do not understand that this patent or these claims in any way depend upon any question of supporting the weight. They pertain rather to such a method of connecting body and ash pan that both must revolve together and yet permit the effective action of a plow which will automatically remove the ashes, and this in a type where there is no shearing in the ash bed. Hughes took from the standard wet ash producer the idea that it was desirable to have a body, ash table, and blast box rigidly connected so that all must revolve together, and he adopted this idea to the ash removal necessity by providing that the sole connecting means should be located centrally of the ash pan, extending upwards from its center and then across to the body. This was novel, and in this function useful. Its valuable result was that it permitted a horizontal member, extending from the center of the ash pan out over its edge, to be held stationary while the pan rotated, and thus gave a plow action in removing the ashes; and it for the first time showed an efficient automatic ash removal. This form also had a considerable degree of novelty, because in the older devices, other-

wise similar, there was no positive connection between body and the pan would not rotate nor the plow operate except imperfectly, because, if the plow obstruction were too great, the pan rotation would stop. We think this construction of the claim, and the scope thereby indicated, are permitted by the state of the art, and, with that construction and scope, Morgan has infringed claims 1 and 2.

[4] The Morgan construction of 1914 is exemplified by the Jefferies patent in suit. A typical claim is:

"1. In a gas producer a rotating ash pan having an unobstructed ash-supporting surface, and a fuel section carried by said ash pan.".

It is obvious that, if in this claim the phrase "carried by" merely means connected to and turning with, then it is anticipated by the Hughes dry ash form; but the circumstances require a different interpretation of these words. What Jefferies did was to modify and rebuild the former standard wet ash producer so that it could still have the advantage of the water and water sealing system, and could also have automatic plow discharge. In the solving of this problem the carrying of the great weight of the shell was the fundamental difficulty, and that was the subject Jefferies was talking about; and, whether in his solution of the weight-carrying problem he made an inventive step is the only question involved under this patent. What he did to the standard wet ash producer was to remove the supporting struts by which the ash pan carried the shell, and by which the ash pan was so obstructed that the plow could not be used, and to so arrange and construct the central blast receiving box in the ash pan that through the attached spider arms it could carry the entire weight of the fuel shell and bed of fuel.

The argument against the validity of the patent is that this involved no invention, because he merely united in one structure the free ash pan and plow removal of the Wellman dry ash producer with the other parts of the wet ash producer. In a sense this is true, but it by no means settles the question of invention in making this combination for the first time. During a period of years, Wellman, making both forms and necessarily familiar with the advantages of each, never thought of combining them in order to get both advantages. Very likely the reason was the natural impression that this great weight could not be carried on a small central post. Jefferies' belief that it could be done, justified by the result, is well characterized by counsel as "a bold thought." In selecting

the necessary parts from the two structures, and combining them into a different form, a considerable number of modifications and changes were necessary. Wellman's counsel undertakes, by a series of drawings, and of wooden models, to show how naturally and easily the substitution and combination can be made; but we observe as to both models and drawings that not only are the sizes of the two forms made exactly the same (and this is permissible enough), but members and parts which would prevent successful union are eliminated, and methods of connection and support which did not exist in the old forms are provided. The ingenuity displayed (and necessarily) in this demonstration of an allegedly obvious interchangeability of parts impresses us as confirmative of the inventive character of Jefferies' act in observing that it could be done, and then making the necessary adaptations and changes. If there were doubt about this conclusion as to invention, it would be removed by the way in which Wellman abandoned his old construction and adopted Morgan's new one.

We notice an insistence that lack of invention is indicated because Wellman shipped his first producer of the Morgan type within a few days after receiving the order, and it is said that this shows that Wellman had to make little change in his existing castings and parts. This is not persuasive. Not only did Wellman then have before his eyes the Morgan structure which had been on the market some years, but the record does not indicate how much time Wellman took to perfect his new form before he told his salesmen that they might take an order.

The fact is, as applied to the Hughes and Jefferies patents, that each of the parties to this case coveted and appropriated an outstanding feature of his competitor's device. We consider all the claims of the Jefferies patent to be infringed.

[5] The Waldburger patent in suit has as its primary feature an annular wind box or chamber surrounding the ash bed hopper and delivering air into the ash bed through perforations in its side. The patent has some rather broad claims directed to the accomplishment of this result in a rotatable producer.

It was old to have just this kind of an annular wind box in a producer which did not rotate. In rotatable producers it was old to bring the air under pressure up into a wind box in the center of the ash bed. When Morgan desired to use, in his generally old rotatable producer, this old external annular wind box, the only problem was to get the air over to it. What he did was to run a pipe or pipes from the existing central wind box out to the external one through the ash bed. This was the natural way to accomplish it, and we do not see that he was in any respect taught by Waldburger, who had shown one method of supplying air to his rotatable wind box but was not the first to get this result. Lackner had already shown another method. Morgan adopted still another. To give the Waldburger claims a scope that would include Morgan would be to make them invalid. We think them not infringed.

The decrees below are reversed, and the cases remanded for the entry of new decrees consist with this opinion.

They should provide that the master, upon the accounting, and in addition to making any desired proper inquiry into profits and damages, should find a reasonable royalty upon each patent infringed, so that resort may be had to that type of recovery if it should eventually be found to be the appropriate measure.

DONAHUE, Circuit Judge, dissents as to infringement of claims 5 and 6 of Lummis 1,274,176 and as to the validity of Jefferies.