**DEWEY & ALMY CHEMICAL CO. et al. v. MIMEX CO., Inc.**

No. 126.

Circuit Court of Appeals, Second Circuit.

Jan. 5, 1942.

John W. Hoag, of New York City (George P. Dike, and George P. Towle, Jr., both of Boston, Mass., of counsel), for appellants.

Maxwell James and James & Franklin, all of New York City, for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiffs appeal from a judgment dismissing their complaint for the infringement of all the claims of Patent No. 1,582,219, issued on April 27, 1926, to Hopkinson and Dewey; and of all the claims of Patent No. 1,765,134, issued on June 17, 1930, to Dewey and Crocker. The judge held both patents invalid; he also held that the defendant did not infringe the first patent; infringement of the second patent is admitted. Both inventions are chiefly useful for hermetically sealing covers to the tops of tin cans. The first describes a cover with a circular groove or recess filled with latex, i. e. liquid rubber, which, when pressed upon a circular ridge in the top of the can, forms an air tight seal. This invention had various defects which it was the purpose of the second patent to cure. That patent disclosed a "sealing composition" of which latex was the base, but which also contained a gum and a hydrophilic colloid associated with a finely powdered mineral; the gum to give viscosity, and the colloid and mineral to give plasticity, to the latex; it has proved useful so far as appears, only as a seal for can covers. We shall speak of the first patent as the "Latex Patent," and of the second as the "Bentonite Patent," "bentonite" being the combination of mineral and colloid principally used. In spite of the difference in the dates of their applications the two inventions where in fact made at very nearly the same time; the date of the invention of the "Latex Patent" was Janu-

ary 13, 1922; that of the invention of Claims 3, 5 and 8 of the "Bentonite Patent" was April 18, 1922; that of Claims 2, 4, 6 and 9 was May 9, 1922; and that of Claims 1 and 7 was June 20, 1922.

### The "Latex Patent"

In the year 1905 the "open-top" or "sanitary" tin can was invented; i. e. a can with a detachable top. Generally the joint between can and cover has to be air tight, and various expedients were tried to make it so; rubber rims, paper gaskets, rubber cement solutions. None of these was satisfactory, so that in 1922, when Hopkinson and Dewey made their invention, the art had waited over sixteen years for a suitable seal. What these inventors disclosed was very simple; nothing more than the use of latex—the natural sap of the rubber tree—as much concentrated as was desired, and usually preserved with ammonia. By this method the amount of rubber in the seal was increased much above that in rubber solutions and rubber rims, and the life of the seal was greatly prolonged because of the physical structure of the latex globules. Beginning with the year 1922 latex became the standard material for seals, and has very largely displaced all other substances; not the mere latex of the patent-in-suit, however, for it very quickly developed that that alone was not feasible mechanically. The art required the seal to be laid upon the cover while the cover was rotating at high speeds, and also that the covers, when completed, should be inspected by an operative who laid them top down along her arm in a slanting position. No concentration of latex was possible which would at once run with enough fluidity to be squirted into the groove of the cover, and yet when deposited would not splash out under the centrifugal force of rotation, and would not run unevenly to one side while being inspected. For these reasons the invention, while serviceable under ideal conditions, did not answer the actual needs of the art; it was the second patent that supplied its deficiencies.

 Latex is a watery substance in which the rubber particles float in colloid form; the advantage of using it is that concentration—i. e. driving off a part of the water—does not injure the particles but only brings them nearer together, the native elasticity of the rubber being retained. The substance had been known for many years; patents for its use go back for over a hundred years; e. g. Hancock's British Patent (1825) No. 5122. Nevertheless, it had not become commercially available in quantity (for it did not carry well except in expensive containers) until Milne disclosed in 1914 a method of shipping it cheaply as a concentrate. (British Patent to Samuel Milne (1914) No. 24,680.) Thereafter it went into large industrial use in Europe, but it was not extensively imported into this country before 1920, by which time new ways of preserving it had been discovered. There is therefore not much antecedent evidence that the invention demanded high originality, even if latex had never before been used to make a seal. As we have said rubber was an old material for that purpose, and latex is only another form of rubber; the patent merely recommended its use as a substitute within a year or two after it became possible to obtain it. We do not mean that the mere substitution of materials cannot be an invention. Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486, 23 L.Ed. 952; Akme Flue v. Aluminite Flexible Flue Cap Co., 2 Cir., 27 F.2d 736; United Shoe Machinery Corp. v. E. H. Ferree Co., 2 Cir., 64 F.2d 101; Samson-United Corp. v. Sears, Roebuck & Co., 2 Cir., 103 F.2d 312. When for example a material has been available for many years, and no one has thought to use it in a new physical combination to answer a need equally old, there is as much reason for treating its selection as evidence of invention as the selection of any other element; and it is unfortunate that loose statements, thrown out arguendo, have at times seemed to give to the substitution of new materials a different standing from that of other combinations—often indeed the question has been quite unnecessarily confused with that of a new use. The difficulty in the case at bar is not therefore that the invention consisted only of a substitution of material, but that the necessary setting did not exist for any invention at all. It is not important that latex had been known for many years, and that a convenient method of shipping it had been known for eight years. We should not count elements that were not commercially available; a substance, long known to chemists, but not upon the market, is practically as impotent upon the art as though it were unknown. The assumption of the law is that the chance of profit from the exploitation of the patent will stimulate discovery, and profit presupposes that the materials are at hand. Regardless, however, of whether this reasoning without more evidence would invalidate the patent,

the patent to Milne, just mentioned gives it its coup de grace. In that patent occurs the following passage (page 3, lines 22-24): "The concentrated latex, preferably while hot, is placed in suitable air and water-tight vessels of convenient shape or construction, the joints being sealed, if necessary, by a coating or lining of latex which on drying ensures tightness." The invention of the "Latex Patent" therefore amounted to no more than making use of Milne's disclosure upon can covers about one year after it became commercially possible to do so; i. e. to do so in quantity. That would scarcely have been enough, even if the new use had answered the needs of the industry. As we have said, it did not; it was indeed one step forward, but the art was not satisfied.

### The "Bentonite Patent"

■ The "Latex Patent" did not go into use as it stood; some way had to be found to stiffen the latex enough to withstand the centrifugal force of rotation and the inspection; and it was also necessary to make the composition thick enough to be applied in squirt guns—elegantly called "extrusion machines." The "Bentonite Patent" supplied both these qualities to the latex. The inventors added a gum which thickened it—ordinarily "karaya gum"— already known as a "thickening agent" (Patent to Dunham, No. 1,334,356 (1920)). They added a new substance, "bentonite," which had the curious result of leaving it liquid under pressure in the squirt gun, and of thickening it at once when it was squirted out. "Bentonite" is a mineral powder in extremely minute particles, which are encased in a substance which will absorb an extraordinary amount of water, and which is therefore known as a "hydrophilic colloid." The inventors supposed that this surrounding substance was organic and were probably wrong; but they understood the structure of "bentonite" and why it had the desired effect upon their "sealing composition." The name is derived from large deposits near Fort Benton, Wyoming; and, although the mineral itself was apparently known by other names as early as 1905, it was not until 1915 or 1916 that it was much discussed in chemical publications, and it did not come upon the market in quantity until about 1919. By that time it had already become known as a "plastic" agent—at least that its power to absorb water made it valuable in rendering clay more easily workable—(Kraus No. 1,509,-406), but that was very far from even foreshadowing that it had the qualities necessary for a sealing composition, or therefore from suggesting its use for that purpose. These inventors knew much more than that; they had discovered the qualities of "bentonite" we have just mentioned and they disclosed them in their specifications in a passage [1] (page 1, lines 84-90, and page 2, lines 1-19) of unmistakable clarity. Kirschbraun on August 16, 1922 (and therefore only a few weeks after the date of the invention in suit), did indeed file an application which resulted in a patent (No. 1,498,-387) disclosing a mixture of "crude or reclaimed" rubber and "bentonite" as an "emulsion of rubber." But even if that had antedated Dewey and Crocker's discovery, it would not have been relevant, for he did not use latex, and there is no evidence that what he got would have been an improvement over the old "sealing compositions" of the art; he neither contributed to the art, nor disclosed any knowledge of those properties of "bentonite" which would have led to any contribution.

The defendant does not however rely upon these patents except as general approaches which narrow the scope for invention; its chief reliance is upon Newton's British patent of 1855 (No. 1053). Aside from the extreme unreality of sup-

---

[1] "Plasticity is the characteristic required to ensure retention of uniform distribution of the sealing material upon the seal-surface until its liquid constituents have evaporated and its deposit has assumed a substantially solid consistency. A substance is plastic which changes conformation in response to pressure above a critical degree peculiar to the given substance, but which retains conformation when pressure upon it falls below the critical degree. Thus the addition to latex of a substance which is characterized by the capacity to increase plasticity will not prevent the resulting composition from flowing through a given aperture or nozzle in response to pressure in excess of a definite critical pressure, but, acting as a plasticity-factor, will prevent or tend to prevent the composition from flowing when such pressure is withdrawn. Thus, latex to which a proper portion of plasticity-increasing material has been added, is applicable to a seal-surface by a jet or stream caused by pressure, but will remain on the surface without further flow, since after deposit all appreciable pressure-differential is absent."

posing that a disclosure, nearly seventy years old and made at a time when the science of colloids was utterly unknown, really helped the art of the next century to combine latex with colloids of this character, an analysis of Newton's disclosure shows that it was altogether inadequate as an anticipation. He wished only to "print or stain" fabrics and he used latex merely "as a vehicle for conveying it" (sic) "to and fastening upon the fabrics aforesaid any of the mineral pigments, lakes and dyes usually employed for coloring, painting and printing." To do this he recommended adding to the latex "as it comes from the tree * * * pigment or color having previously been reduced to a finely divided state. Those which are not sufficiently fine may be ground in an indigo mill, or in any other suitable manner." There are several ways of giving "the material thus prepared a sufficient consistence"; one is to evaporate the latex; another is to use gums "as thickeners." Newton disapproved of both: evaporation was very expensive, and gums would be "washed out" before the color could set. "To remedy this * * * the Inventor discovered that this end might be fully attained by the mixture of milk * * * with the liquid juice" (latex). "In place of milk, albuminous substances, such as the white of eggs, may be employed." The only claim was for the use of latex "as a vehicle for the application of coloring matter, and the means of rendering it more or less liquid, as above set forth."

The defendant's argument that this is an anticipation is as follows. If the pigments of which Newton spoke are thoroughly mixed with a gum and the mix is then "reduced to a finely divided state" by being "ground in an indigo mill," the equivalent of "bentonite" will result; that is, a substance will emerge which is made up of minute particles of mineral surrounded by a "hydrophilic colloid." This when used with latex, as Newton recommended, becomes a complete reproduction of the patented "sealing composition." To prove this Miller, the defendant's expert, made a number of experiments, using not only the pigments mentioned by Newton, but others known in 1855. He mixed these with a gum—tragacanth—and ground the mix in a "colloid mill"—incidentally a machine not known in 1855—and he then mixed the resulting product with latex. The specimens which he got he declared to be the equivalent of the patented "sealing composition." Hauser, the plaintiffs' expert, whose attainments and honesty the district judge commended and whose conclusion he apparently accepted in the main, said that only two, or at most three, of these specimens were not already on the way towards "coagulation" which is prohibitive in practice, and two of these chanced to be made with pigments not mentioned by Newton. The judge also found only two of Miller's specimens free from "incipient coagulation," though one of them—"ultramarine"—was not one of those which Hauser conceded to be free. As there is in any case no finding that more than two were not already "incipiently" coagulated, and as the defendant has the burden on the issue, we conclude that the rest were not equivalents of the patented product. Hauser swore that, although it was possible synthetically to produce a substance like "bentonite" from pigments,—it could only be done by pulverizing them in what is known as a "ball mill" for 72 hours. Considering the two specimens we have mentioned, we conclude therefore that this process is not invariably necessary; but that without it success is most unlikely.

No doctrine of the patent law is better established than that a prior patent or other publication to be an anticipation must bear within its four corners adequate directions for the practice of the patent invalidated. If the earlier disclosure offers no more than a starting point for further experiments, if its teaching will sometimes succeed and sometimes fail, if it does not inform the art without more how to practice the new invention, it has not correspondingly enriched the store of common knowledge, and it is not an anticipation. [2]

---

[2] Seymour v. Osborne, 11 Wall. 516, 555, 20 L.Ed. 33; Tilghman v. Proctor, 102 U.S. 707, 711, 712, 26 L.Ed. 279; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 66, 43 S.Ct. 322, 67 L.Ed. 523; (Second Circuit) Westinghouse Air-Brake Co. v. Great Northern R. Co., 88 F. 258, 263; Hillard v. Fisher Book Typewriter Co., 159 F. 439, 441; United Chromium, Inc., v. International Silver Co., 60 F.2d 913, 917; H. K. Regar & Sons v. Scott & Williams, 63 F.2d 229, 231; (Third Circuit) Skelly Oil Co. v. Universal Oil Products Co., 31 F.2d 427, 431; American Safety Table Co. v. Singer Sewing Machine Co., 95

At times courts have spoken as though greater certainty of anticipation were necessary in the case of foreign patents than of domestic, but that distinction we need not press; and indeed we should in any case be slow to do so, except so far as the authorities require. Tested by this doctrine, Newton's disclosure was inadequate for several reasons. We do not rely upon the fact that he was not concerned with making a "sealing composition," but only with finding a carrier for pigments effectively to "print or stain" fabrics; we shall assume that if his process would have uniformly resulted in the patented seal, it would have been a good anticipation even though it took a second authentic act of creative imagination to discover its fitness for the new use. The difficulty lies, not in his failure to anticipate the new use, but in what he actually disclosed and failed to disclose. Even if he had recommended the use of gum with pigments, and even if his direction to grind the pigments fine had been a direction to use the equivalent of a "colloid mill," success or failure would have remained the sport of accident, as we have seen. It was hit or miss for the best of reasons; Newton was not aiming at the target. That alone would have been enough. But it was by no means all. To tell the art to grind the pigments "sufficiently fine * * * in an indigo mill" (what that was, the record does not disclose) must be read in its context. "Sufficient" for what? "Sufficiently" only to "print or stain" fabrics; which gave not the slightest inkling that one must comminute the pigments to colloidal size, the meaning of which nobody in 1855 could even faintly have comprehended. Again, instead of directing practitioners of his method to mix gum and pigment, Newton told them to avoid gums; true, that was one way to do it, but a bad way, for gums "are liable to be washed out before the colour is entirely set." Indeed, the whole purpose of the invention was "to remedy this"; so that, instead of prescribing the method that Miller employed to make a synthetic "bentonite," Newton pointed in directly the opposite direction. Finally, Newton did not suggest as a first step that one should mix the pigment and the gum, and as a second that one should grind the mix; but just the reverse: grind the pigment and mix the gum (that is, if one insisted upon disregarding his admonition not to use gum at all). It does not appear that this is not vital; i. e. that it is the grind of both together that produced such measure of success as Miller got at all. Thus, it is no parody to say that Newton's contribution to the invention was this: if one disregards his injunction to avoid gums; if one grinds a mixture of gum and pigment more than "sufficiently" to "print or stain" a fabric—i. e. "sufficiently" for a purpose wholly unheard of in 1855—if one inverts the order of the steps of grinding the pigment and mixing the gum, one may occasionally get the "sealing composition" of Dewey and Crocker, but the chances are strongly against it.

For the foregoing reasons it seems to us that the claims are valid. The invention has had a most exceptional success; the business of one of the plaintiffs, which had been threatened with extinction by the paper gasket, has become stable; its sales have risen to several millions a year. Other seals, like rubber rings and paper gaskets, have practically disappeared; at an exposition in 1927 the American Chemical Society awarded a prize to the composition as one of the six outstandingly important developments in industrial chemistry; the spoilage of the contents of tin cans has been reduced very greatly by its use. It would indeed be absurd to rank the invention as a great pioneer such as come only at rare intervals and are the work of genius. Indeed, it is precisely those which probably need no patents to call them forth; the stimulus of profit has little or no part in their production. The patent law is aimed at animating a lower order of imagination and skill than that; more, it is true, than the ordinary rub of competition automatically brings out from competent workmen in the art, but not the superlative skills—at least that has been its uniform avowed purpose. Perhaps the system is outworn, but while it stands, it stands clothed with its history like any other statute, and it seems to us that not to recognize so substantial an achievement as this which has resulted in the improved preservation of foods and other perishable goods, would

F.2d 543, 549, 550; (Fourth Circuit) McKee v. Graton & Knight Co., 87 F.2d 262, 264; (Sixth Circuit) Morgan Construction Co. v. Wellman-Seaver-Morgan Co., 18 F.2d 395, 399; (Ninth Circuit) 4 F. 2d 463, 465; (C.P.D.C.) In re Ek. 57 App.D.C. 203, 19 F.2d 677, 678; Becket v. Coe, 69 App.D.C. 51, 98 F.2d 332, 335; Ct.C. & P.App. In re Cramblet, 62 F.2d 358, 359.

deny recognition where recognition most is helpful. These inventors did not move along a well-marked way; they struck out a new path which led to a goal that men had unsuccessfully tried to reach for many years. To say that for this they needed to look no further afield than the ordinary routineer, one must shut one's eyes to all the significant facts.

Judgment affirmed as to the "Latex Patent."

Judgment reversed as to the "Bentonite Patent."