**WABASH CORPORATION et al. v. ROSS ELECTRIC CORPORATION et al.**

Civ. No. 2430.

United States District Court
E. D. New York.

March 27, 1950.

See also D.C., 81 F.Supp. 511.

Kenyon & Kenyon, New York City, for plaintiff Wabash Corporation.

Arthur G. Connolly, Wilmington, Del. (Theodore S. Kenyon, New York City, Arthur G. Connolly, Wilmington, Del. and Edward A. Ruestow, New York City, of counsel), for plaintiff· Hartford National Bank & Trust Co. (Trustee).

Alexander C. Neave, New York City (Harry R. Pugh, Jr., New York City, Vernet C. Kauffman, and James J. Lazna, of counsel), for defendants.

GALSTON, District Judge.

This is an action for the infringement of two patents issued to Cornelis Korver; one, No. 2,115,423 on April 26, 1938 for a method and device for transporting wires; and the second, No. 2,162,847, issued June 20th, 1939, for a photoflash lamp, on an application originally filed as part of the application for the former patent and later divided therefrom.

The former patent will be referred to as the process patent and the latter as the product patent.

The defendants deny infringement and allege invalidity of the patents. In the process patent, claims 1 to 6 inclusive, and claim 10 are relied on; and all three claims of the product patent are involved.

Despite the division of the two Korver applications resulting from the action of the Patent Office, the two patents are very closely related. In the effort to produce a photo-flash lamp which would avoid the difficulties encountered in the prior art, Korver devised a method for mechanically filling the bulb. Prior to Korver the art had known only manually filled flash bulbs such as that made by the General Electric Company about 1930. The bulb of that period was made pursuant to the invention of Ostermeier, described in United States patent No. 1,776,637. The Ostermeier lamp consisted of a glass bulb filled with oxygen into which had been forced thin aluminum sheet foil, so that when the current was passed into the bulb, the foil would burn with an intense light; and since the combustion occurred within the bulb, the disadvantages encountered by photographers theretofore in the use of the flash powers in an open space were overcome.

The Korver method patent describes an invention for introducing a thin wire filling into photo-flash lamps. The specification recites the difficulty of transporting through a tube a wire of small mechanical strengh, by means of a pressing or pushing action, without the use of a drawing or pulling action. So in accordance with his invention Korver provided a gaseous medium, and claimed that the wire could be distributed with great uniformity and in a curled state within the limited space. The specification also recites that in addition to transporting the wire, the gas used has a straightening action· upon the wire, so that the curling power will cause no difficulties during the travel such as might be expected when the wire touches the inner surface of the tube through which it is being transported.

Claim 2 may be taken as a fair statement of the invention. It reads: "A method of uniformly filling a hollow body closed except for a single aperture, with an internally-strained wire of small mechanical strength, comprising the steps of carrying

the wire through the aperture and into the hollow by a stream of gas leaving through another portion of the aperture, and distributing the wire in a curled condition and as uniformly as possible within the hollow by the recurrent flow of the gas therein."

The defendants rely on a number of patents of the prior art to establish that it was old before Korver to use a stream of air to transport different kinds of material into various containers, including lamp bulbs; that it was old to strain wire to make it curl, and to fill it loosely in containers so as to effect elasticity.

The Schur patent, No. 1,915,451, issued June 27, 1933, is for a method and means for directing and accumulating strand material. Schur deals with strand material such as "is being fabricated continuously at a high rate of speed and where such strand material is so light that when allowed to proceed unsupported through the atmosphere from the fabricating means to an accumulator, air currents tend to misdirect it from the desired course". He seeks to direct the continuous strand material through an atmospheric gap to an accumulator in a confined stream of gaseous medium which flows to that accumulator. By his invention he claimed that it becomes possible to control the direction of the strands as each strand is surrounded by a confined stream of gaseous medium. Figure 2 of this patent shows the strand material being blown through a tube by compressed air and deposited in a container. Figure 3 shows an inlet nozzle with separate openings for compressed air and for the strand material. The outlet nozzle is indicated in figure 4. Figure 5 is a modification in which instead of using an air jet for creating a suction at the intake end of the strand-directing tube, he takes the strand through a tube into a stationary container which is constantly being evacuated by another tube leading therefrom to the vacuum pump. This passage may be emphasized: "The container 14 being closed, other than communicating with the evacuating means by the tube 15 and with the atmosphere by the tube 13, produces a suction at the intake end 12, wherefrom

a stream of air is caused to flow through the tube to serve as a positive carrying vehicle for the strand." Schur explains that by the expression "strand material" he means a pulp ribbon in rolled-out condition, but adds: "it is obvious that my method is applicable to strips or ribbons which in being directed to an accumulator present difficulties similar to those encountered with strand material."

Under cross-examination defendants' expert Noel admitted that there was nothing in the Schur patent which mentions or refers to an internal strain in any strand material used; that there is no effort to surround the filament with gas spaces, but that on the contrary the turns of the coil are spaced as close to one another as possible, and that there are no curls or undulations in the material deposited in the spining pots; and finally that the air that flows out of his pot has no function in locating the material on the walls of the pot, or carrying it in the direction in which it comes out of the pot.

At least Schur and Korver were concerned with transporting material into a container. Nevertheless Korver went further than Schur, for his method provided for the curling of a fragile wire, which may be both temporarily strained by and transported in a stream of moving air; nor does Schur disclose that by reversing the direction of the air flow the material could be uniformly distributed throughout the space and locked in position. As between Schur and Korver, Korver could not have learned from Schur much beyond the principle that a stream of air could be employed to introduce certain materials into a container (but not a bulb).

Patent to J. A. Wolle, No. 1,689,093, issued October 23, 1928, is for a method and apparatus for making curled wire. This inventor sought to provide a method and apparatus for making metal sponge or similar products composed of flat wires or filaments which are curled or convoluted. The specification discloses that flat wires or ribbons, while passing between flattening rolls and tension rolls, are drawn over the edge of a curling blade. The edge of this blade is sharp, and the drawing of

the flat wires or ribbons over this edge, while the wires or ribbons are under tension, produces a curling tendency in the flat wires or ribbons (Wolle patent, p. 2, column 2, 11. 116–125). The specification then continues: "The curling tendency thus produced would cause the flat wires or ribbons to immediately curl up if the wires or ribbons were free of tension." This patent also provides for feeding the curled wires into sloping chutes to carry the wires to separate measuring receptacles. The inventor says "In order to insure the feeding of the curled wires along the troughs or chutes 44, and thereby assist gravity to effect the prompt delivery of the curled wires to the respective measuring receptacles, means is provided for producing an air blast at the entrance end of each trough, the air blast acting in the direction in which the wire feeds along the trough."

Patent to Sedgley, re-issue No. 18,576, is urged by the defendant to show that it was old in the art to curl wire by pulling it over an edge and using a stream of air to feed it into a container. This was issued August 23, 1932 for a method and apparatus for making coils. The object of the invention was to devise a method and apparatus for making such coils wherein a continuous travel is imparted to a wire which, during such period, is subjected to a forming operation and thereafter to a coiling operation. The wire, after passing between forming rolls is a thin ribbon or band. The wire passes around the stationary grooved rod and over a bar or blade, which causes it to assume the form of a coil as soon as it leaves the take-up rolls. There is provision made for compressed air to air nozzles, the discharge ends of which are positioned above the cartons, and to which the coils have been advanced.

These three patents, to Schur, Wolle and Sedgley, are relied on to show the invalidity of the filling device patent.

In terms, none of the three patents discloses the method defined in Claim 2, heretofore quoted. None contains a sufficient instruction which would enable a person skilled in the art to fill a hollow body such as a photo-flash lamp. Though there were other patents of the prior art offered,—to Franke, No. 891,830, June 30, 1908, for a method of filling mattresses; No. 1,937,446 to Stampe, issued November 28, 1933, for a purifying device for air and gas and method of producing the same; and to Fagan, No. 1,830,598, November 3, 1931, for a method and apparatus for coloring lamps—none of these patents bears remotely on the Korver method of filling a photo-flash lamp. The plaintiff, I think, presents an unanswerable argument in asserting that none of these prior art inventors was occupied in fields which presented problems such as Korver had to meet and which he solved. None showed that an internally-strained wire of small mechanical strength could be carried through an aperture and into a hollow body by a stream of gas leading through another portion of the aperture, and more particularly which distributed the wire in a curled condition uniformly within the hollow body by the recurrent flow of the gas. Korver solved, by means of the method which he defined in the device that he described, the problem of filling tubes such as were employed in the photo-flash art.

However, it is questionable whether of the claims in suit, claims 1, 3, 4 and 10 are valid. These claims are not limited to a method for filling a structure such as a flash lamp bulb. That in essence was Korver's solution for his specific problem, and constituted his invention. Because of their breadth, in terms at least, these claims afford no contribution over the disclosures in Schur, Wolle and Sedgley. But the remaining claims at issue, 2, 5 and 6, are not met, and do show a contribution to the art that merits the stamp of validity. Particularly is this so since the photo-flash bulb art, from the time of the manufacture of the first of such bulbs by the General Electric Company in 1930 up to the time of Korver's invention, and its adoption in industry in or about 1935, knew only of the filling of such lamps manually. So Korver's mechanical method met an existing need.

We come now to the issue of infringement of those claims. Plaintiffs suggest,

in this connection, claim 2 as a typical claim. That claim has been quoted in the foregoing part of this opinion. The accused operation is described in a stipulation forming part of the plaintiffs' case relating to machines and method for making and inserting the shredded material in the lamp bulbs. It appears that the foil is purchased from the usual commercial sources, and is of the same grade and thickness as is sometimes used in wrapping cigars. The roll of aluminum foil is unrolled and passed through a tank containing a lubricating solution. This lubricating solution adheres to the sheet of foil and enables it to be cut more readily. The sheet then passes through feed rolls to a rotary cutter. The top feed roll has a smooth rubber surface, and the bottom roll has a smooth steel surface. The rotary cutter comprises a cylindrical drum, having a series of spaced knives on its surface and a fixed "bed-knife" having its cutting edge parallel to the axis of the drum and so positioned that each of the spaced knives on the drum cooperates therewith to produce a shear. Rotation of the drum moves a knife blade past the bed-knife. The point of contact, or close shearing relation of the knife blade with the bed-knife, moves along the length of the bed-knife. As each knife comes into contact with the sheet, which lies upon and projects beyond the knife, a narrow strip of filament is sheared off progressively across the width of the advancing sheet from one end of the strip to the other. Speeds of the feed rolls are adjustable.

The stipulation recites that under a microscope the strips are seen twisted about their axes, and they possess burrs at their sheared edges. The narrow strips are drawn into one or other of two intake nozzles connected by feed tubes to a pair of separate filling head structures. Each nozzle is flared in the direction of the length of the bed-knife and is a short distance below. Each filling head comprises an upwardly opening cylindrical cup having a sealing ring at its upper edge, and a central tube extending upwardly above that edge and downwardly through the bottom of the cup. It is to that down-wardly extended portion of the tube that the feed tube leading from one of the intake nozzles is connected in an air-tight manner. It is important to note that from the side of the cup leads a connection, through a trap, to a vacuum or suction system. Air is exhausted from the bulb by a vacuum pump. The suction causes a rush of air into the nozzle below the rotary cutter, then through the intake tube and into the bulb, and then out through the restricted passage, and the air passes out through the trap to the suction system. It is this rush of air which carries the strips from the outside into the bulb. The stipulation reads: "The strips are probably drawn into the tube in 'hair-pin' form * * * and are then carried through the tube by the air flow therein." In the bulb the strips form into a tangled mass of crumpled shreds bent in any direction at non-uniform intervals. After the bulbs are filled they are placed over an air nozzle which directs into the bulb a jet of air which fluffs out the shredded material.

When claim 2 is read on the foregoing method, there arise questions concerning (1) whether the defendants' method involves an "internally-strained" wire, and (2) whether defendants' method of injecting cut strips into the bulb is the equivalent of the continuous operation of long length filament indicated by the Korver method, and (3) whether the distribution of the material by the defendants is in a curled condition, having uniformity, and with the use of a recurrent flow of gas.

The defendants' position seems to be that they avoid infringement because the Korver device is designed to handle a continuous wire and therefore has no need for the unrolling and control features of the defendants' machine. But those limitations are not set forth in the Korver claim.

Secondly, the defendants suggest that because Korver used compressed air, and the General Electric Company a vacuum, there is avoidance of the Korver method. I think, however, it is fair to say that since the claim refers to "a stream of gas", the use of a vacuum is not an evasion of the claim. Whether air pressure or vacuum is used, the same object is served.

Defendants then urge that the feed tube of the Korver patent is different from the defendants' feed tube, pointing out that the former has a tiny inlet for the wire and an enlarged outlet, whereas the defendant has the larger end at the inlet, and the outlet end is smaller, so as to increase rather than decrease the velocity at that point.

But here again there is nothing in the claim which would make such a difference an avoidance of the claim. The plaintiffs are correct in their contention that the terminals are but parts of the apparatus and the same results are achieved.

The fourth point raised by the defendants is that though the Korver wire is unreeled and blown through a tube under tension to straighten it temporarily, the defendants' shreds are freely drawn into and through the tube without tension and without straightening effect. But the claim under consideration makes no reference to unreeling, and in terms the claim is not limited to the straightening of the wire. It is quite likely though that the wire must be straightened, temporarily at least, in transit, as a result of the use of gas. At least so says the Korver specification.

As a fifth point the defendants argue that unlike Korver, the defendants' filling method does not deal with or produce a material which has been internally-strained so as to assume a curled condition when released. The method does limit the filling of the hollow body, i. e. the tube, with an "internally-strained" wire of small mechanical strength. Have the shreds of the defendants in the method that the defendants employ an internal-strain? It is true, as plaintiffs argue, that the shreds "are forced into the entrance of the intake nozzle by the air flow", as Noel admitted, and as he also admitted, the vacuum whips the ends of the shreds over the edges of the intake nozzle. Plaintiffs also point to the evidence of wear at the edges of an intake nozzle and the kinked curl and twisted appearance of the shreds in the bulb.

However, Noel was of opinion that the difference between the Korver method and the defendants' method in respect to this matter of internal-strain is that in the Korver method is shown a wire which has been internally-strained by being pulled over an edge under tension so that when the wire is released the particular internal-strain introduced will effect a curling in the wire. That is not true, says Noel, in the defendants' method employing shredded foil strips, for when the shreds are released they do not exhibit a similar curling. Noel, referring to plaintiffs' Exhibit 26, explained that the shredded foil strips therein are in the same condition as they are when dropped from the cutter and before having been transported into a bulb. He said that there is no substantial tension on these foil strips when they are drawn into the feeding nozzle because the shreds are extremely light, and that there is no curling similar to that produced by the Korver method. Noel also argues that there is no uniformity of distribution because as these light shredded strips emerge from the loading nozzle they are thrown against the top of the bulb where they are bent in haphazard fashion. Moreover since the length of the strand is eight inches, and the diameter of the bulbs varies from one and three-eighths inches to two inches or so, the longer strands must bend in order to stay in the container. That they may do without curling.

Uniform distribution is an important element of the claims alleged to be infringed, and the reason is that such a distribution is essential for the best operation of the flash bulb. Noel's opinion is that there is no uniformity of distribution because as the light shredded strips emerge from the loading nozzle, they are thrown against the top of the bulb and thus bent in haphazard fashion. Noel testified that in order to get uniform distribution after the bulb was filled, the defendants found it necessary to use an independent fluffing operation with a jet of air somewhat similar to the tangling jet of the Sedgley patent.

The phrase "the recurrent flow of the gas" is defined as part of the method in claims 2, 5 and 6 of the claims in suit. It is by this step in the method that Korver succeeds in "distributing the wire in

a curled condition and as uniformly as possible." In general usage the term "recurrent" is used in the sense of *repeated*, but is not so used in the patent. There apparently the term is used to define the "reverse" flow of gas. The Korver specification refers to the arrows to indicate how the air after entering the bulb reverses its flow and passes out of the bulb at the neck end. This description of the illustration to which it refers is the only instruction to be found of any reverse flow of air. Now conceding that the material in the defendants' lamps, even before the last step of fluffing, is found in a curled condition within the bulb, it would appear that such condition is the result of the shreds being rumpled and bent by striking against the bulb wall after being blown into the tube, and by being tangled with one another as they accumulate within the bulb. But so far as internal strain is possessed by such wire, it does not appear that an internal strain is imparted to the filling material before it is carried into the bulb within the meaning of the Korver patent. The plaintiffs urge, however, that the defendants' method was admitted by defendants' witness Noel to conform with the process described in the Rippl-Isaac patent, No. 2,-351,290, and the Geiger-Davidson patent, No. 2,347,046, both of which patents are owned by the General Electric Co. The former patent does refer to the shreds used as the filling of the lamp as being in a "curled, crinkled or crumpled condition in the bulb", and in the latter patent the patentee states: "Observation of the rumpled mass shows that the strips 11 are bent in every conceivable direction in a variety of loops or arcs of different size at nonuniform intervals, and present, in general, a curled appearance."

Nevertheless we find in the Geiger-Davidson patent the explanation that the curled and rumpled condition of the defendants' filling material is caused by the shreds impinging on the bulb "with sufficient force to be bent and rumpled in a tangled fluffy mass," but the patent continues: "During the course of the travel through the nozzle 21, the tube 20, the fitting 19 and the inlet tube 14, the strips are rumpled somewhat because of their very slight strength and speed of movement, but it is not until they strike the interior of the bulb 10 that the major part of the rumpling takes place. At this latter moment, the strips 11 are very likely tangled with preceding and succeeding strips 11, and form a tangled mass * * *".

The Rippl-Isaac patent also attributes the ability of the shredded foil to maintain its shape within the bulb to its light and fluffy condition, but distinguishes it from the wire of the Korver process, and states, after asserting that their own foil material possesses very little if any elasticity: "The light and substantially inelastic shredded foil filling material, according to the invention, is thus quite different from wire filling material such as disclosed in United States patent No. 2,162,847—Korver, issued June 20, 1939. With such wire material, it is necessary to introduce an internal strain in the wire in order to impart inherent elasticity thereto. It is the inherent elasticity, then, of the wire itself which serves to maintain such wire filling material in an expanded condition, the wire possessing elasticity to a degree such that the wire filling cannot be compacted even when the lamp bulb is subject to excessive impacts."

It must be concluded then that if these patents to Rippl and Isaac, and to Geiger and Davidson, accurately describe the defendants' process, although defendants' material in the bulb is in a curled condition, such condition is the result of the shreds being rumpled and bent by striking against the bulb and being entangled with one another as they build up within the bulb. Thus the Korver method which involves imparting internal strain to the filling material before it is carried to the bulb is not the method of the defendants.

The plaintiffs, however, sought to show that the groove in the intake nozzle, as they argue in their brief, is the result "of the force of the air current applied in one direction to the bend of the hairpin and the inertia applied at right angles by the mass of each leg of the shred as it is

forced to accelerate from zero velocity to high velocity, first toward the axis of the inlet pipe, and then over the edge of the nozzle into line with the axis of that pipe". But no evidence was presented as to the condition of the material when pulled over the nozzle edge in the actual operation of that device. It does not follow from Anderson's testimony nor Parker's that in such actual operation a sufficient internal strain is developed. It is doubtful too whether the Parker demonstration fairly represents the defendants' method. The vacuum pressure used in the demonstration by Parker was three and a half inches of mercury—75% more than the vacuum pressure used by the defendants, which at its greatest value is only two inches of mercury; secondly, whereas defendants' operation introduces a minimum of 110 shreds into a bulb in the space of about three seconds, about four shreds were introduced in the space of between ten and twenty seconds in the Parker demonstration. The demonstration on the whole falls short of meeting the defendants' contention that the condition of their filling material within the lamps is substantially the result of the striking of the shreds against the bulb wall and the consequent entangling as they are swirled around.

It would seem, therefore, that the plaintiffs have not carried the burden of proving infringement, since there is no proof that the wire shreds constituting the filling of the defendants' bulbs have an internal strain within the meaning of the Korver specification; and secondly because to effect a substantially uniform distribution of the wire strips, there is no showing by the plaintiffs that such distribution is effected by "the recurrent flow of the gas" as used in the Korver specification and claims. Indeed there is no proof that defendants' lamps would operate with any necessary degree of success without the fluffing step which makes successful operation possible. It is for that reason that Weiss v. R. Hoe & Co., 2 Cir., 109 F.2d 722, can be distinguished.

The Korver flash lamp patent charges infringement of the three claims. The invention relates to bulbs having a filling of wire of little absolute strength. The inventor explains that prior to filing his application for the method and device patent it had been difficult, if not impossible, to transport or carry such a wire for the purpose of filling a flash bulb lamp. Korver says to obtain complete combustion in prior art lamps a large excess of oxygen was used; such excess is rendered unnecessary by his invention. The flash lamps, so the specification recites, manufactured in accordance with the invention, have a very short "flash time" and very short "contact time". By the latter term is meant the lapse of time between the instant at which current is supplied to the bulb and the instant at which the emission of actinic light begins.

It will be recollected that this patent was issued on an application which formed part of that for which the Korver process patent was issued. It is for that reason that one finds considerable in the specification which is included in the specification of the process patent heretofore disclosed.

Claim 2 may be taken as a typical claim. It reads: "A flash-lamp comprising a container of actinic light-transmitting material having an active portion, a mass of thin undulated wire disposed within said active portion so as to be elastically supported from the wall thereof, and a gas which upon ignition enters into an actinic reaction with said wire, said wire being arranged in a serpentine course so as to be in substantially uniform spacial distribution."

In pressing the defense of invalidity, greatest reliance is placed on the patent to van Liempt, No. 2,037,101, granted April 14, 1936 on an application filed April 28, 1934. This patent was issued to the N. V. Phillips Co., the same assignee as is named in the Korver patents in suit. The van Liempt patent has to do with flash lamps for photographic bulbs. The specification recites that the combustible materials which have been found most suitable for the purpose in the prior art are aluminum and magnesium. Of aluminum he said that it is comparatively difficult to ignite, and ignition could only be effected in case it was in the form of foils of extreme thinness. He observed that the handling of such thin

aluminum foils and their insertion into the bulbs are comparatively difficult and require careful manual operations. He then says that the handling and mounting of aluminum wire are much simpler, and concludes that aluminum being an easily drawable metal, the wire could be used instead of the aluminum foils. A discussion of advantages of magnesium follows, and van Liempt then says that his invention is based on the idea of combining the useful properties of aluminum with those of magnesium as an excellent combustible material for flash lamps. Van Liempt states that with the use of his drawn wire, "lamps can be made in smaller bulbs than the flash lamps presently used for the same or even a greater amount of actinic radiation". The relation of the van Liempt patent to Korver's invention is relevant in respect to the wire content of the lamp, but offers nothing in respect to the distribution of the content nor of the elastic support defined in the Korver claims.

Anderson, of the Wabash Company, testified that they had made lamps in accordance with the van Liempt patent, but did not sell them because they were not satisfied with the characteristics of the lamps from the standards of uniformity and light output.

The patent to Ostermeier, under which the defendants were manufacturing their manually filled flash lamps, shows a loose filling of crumpled foil which was substantially distributed throughout the bulb and was in contact, as shown in the drawing, at irregular places, with the bulb wall. The specification makes no reference to such support. As for the distribution of the foil, Ostermeier was concerned only with the necessity of having the foil within effective range of an ignition device in the bulb.

The Ostermeier lamp emits a flash of light characterized by a very rapid rise from zero to a peak of maximum intensity. According to the testimony, this rapid rise is followed by a corresponding rapid fall of light intensity peak to zero. When a flash curve is plotted for the Ostermeier lamp, it is seen to rise sharply, almost vertically, and to drop with equal sharpness.

The shape of the curve is that of a high sharp peak. It is to be noted that the crumpling of the foil made necessary in the filling of the lamp by keeping the sheets apart, permitted the oxygen to fill the spaces thus formed. However, portions of the foil were pressed against the bulb wall and thus prevented a proper distribution of oxygen around those portions of the foil. There resulted failure of uniform combustion and a variation in flash time among the lamps constructed. The Pipkin patent, No. 2,142,372, issued January 3, 1939, assigned to the defendant, General Electric Company, points out this failure: "Another disadvantage of the foil lamp is the incomplete combustion of that portion of the foil resting in contact with the glass of the bulb. When such a lamp is flashed, the cooling effect exerted by the glass on that portion of the foil in contact therewith either retards the rate of combustion of such portion of the foil or may even prevent any combustion of the same. Such a condition results in an appreciable loss in the amount of available actinic light."

Pipkin also comments on the manufacturing weakness attending the production of the foil flash lamp and stresses the necessity for manufacturing flash lamps which will operate uniformly. Noel admitted that the Pipkin criticism accurately described the disadvantage inherent in the earlier Ostermeier lamps.

Van Liempt also referred to the difficulties attending the production of aluminum foil lamps. He said: " * * * there is a high percentaged variation in the thickness between the several foils. Due to such variations in the thickness of the foils, the time of combustion and the time and amount of actinic radiation, may vary for the individual flash lamps." Comment is made also about the high cost of production of the foil lamp.

Other prior art patents were also cited by the defendant and will be briefly referred to.

In Nichols, No. 1,995,938, issued March 26, 1935, for a flash lamp, the inventor recites that the flash material may be foil, wire, powder or similar form. He says:

"Speed of the flash is largely a function of the fineness of these materials."

Patent to Kobayashi for a flash lamp, issued on April 18, 1933, recites: "Referring to the drawing, by invention comprises a glass bulb, 10, and a loose filling of a combustible material, 11, therein, consisting preferably of a thin foil or ribbon or metal, such as aluminum or magnesium."

British patent No. 403,427, and British patent No. 403,638, both to Crowley, relate to improvements in flash light devices. In the former reference is made to a flash light strip or foil in the bulb. In figure 1 there seems to be a fairly uniform distribution of the material, but unlike Korver, the point is not made in the specification, nor does there appear to be the bulb support defined in the Korver claims.

Patent No. 888,124, granted May 19, 1908 to Shedlock, relates to an invention for a particular form of metal wool composed of more or less intertwined or interlaced crimped filaments. The filaments are formed by passing a sheet of metal between rotary circular cutters. This patent has no reference to flash lamps and relates rather to the scope of the Korver claims, since the defendants claim that the shredded foil of its lamps is a form of metal wool described in the Shedlock patent.

Three patents are relied on to show the use of curved, crumpled and undulated material.

The patent to Waldo, No. 1,320,514, granted November 4, 1919 for a flash or flare product, discloses that the inventor reduced magnesium or similar combustible material to shaving-like form and intermixed the attentuated particles, which are described as of irregular curvature "so as to produce therein a multiplicity of interstices that promote and insure the free distribution of oxygen throughout and in intimate association with the individual particles." It is said that the thinness of the metalic particles, when they are heated in the presence of the freely distributed oxygen, promotes quick ignition and combustion. This patent as prior art herein serves no purpose other than to show that the fragmentary strands are comparable with the undulations of the Korver wire. No reference is made to the flash bulb art.

The patent to Maiser, No. 2,029,578, granted February 4, 1936, on an application filed February 24, 1933, is for a flash light. It is not particularly helpful except as showing the use of crumpled, thin foil.

The patent to Leijdens, No. 2,091,601, granted August 31, 1937 for a flash lamp, was filed March 15, 1935. But this patent cannot be regarded as prior art, Celanese Corp. of America v. Ribbon Narrow Fabrics Co., 2 Cir., 117 F.2d 481.

In sum, it appears from the foregoing study of the prior art that Korver was the first in the particular art to set forth a combination of undulated wire elastically supported from the wall of the container and uniformly distributed in the bulb. Was that contribution of Korver an invention?

Plaintiffs' witnesses testified that there was much greater elastic support in the Korver lamp than in the Ostermeier lamp; and though the lamp disclosed substantial distribution it was haphazard and uniform only in the requirement that the foil be within range of the ignition means.

In operation a comparison of Ostermeier and Korver lamps discloses that though the total light output was substantially the same in both, in Korver the flash of actinic light rose from zero to its greatest intensity in a much slower curve, but the slower rate of ignition was rapid enough to meet the high speed requirement for flash lamps. The evidence also shows that the maximum intensity point in the Korver lamp was much lower than that of the Ostermeier lamp, i. e. the flash curve stopped its rise and rounded off much sooner; furthermore it appeared that the high point of light intensity was more prolonged than in the Ostermeier lamp. Anderson said that in the Korver lamp the rounding off high point had the appearance of a low plateau, and Ostermeier that of a high sharp peak. Apparently the low plateau characteristic is regarded as very desirable as it provided a more prolonged period of time during which the camera shutter could be operated to expose the sensitized film to the comparatively intense light. This prolonged period of high intensity provided more uni-

form light on the exposed film. This operation made better pictures possible, while allowing a greater margin of error in synchronization between camera shutter and flash.

In this connection Pipkin observes: "The foil flash lamp is also unsuited for use with cameras equipped with shutters of the focal plane type for the reason that the duration of the high intensity portion of the flash is appreciably shorter than the time required for the camera shutter slit to travel across the width of the sensitized film. Thus, even though the camera shutter is operated at the peak of the flash, various portions of the sensitized film will be exposed to a different degree of light intensity, resulting in inferior pictures."

Korver, on the other hand, was able to avoid compacting the filling and yet to introduce a sufficient amount of thin wire to yield light of the required high intensity, and by distributing the filling uniformly succeeded in surrounding the curled wire with the required amount of oxygen.

It appears also true that the folds of aluminum foils of the Ostermeier lamp resulted in less uniform combustion than in Korver. The greater mass of the sheets of aluminum foil occupies more of the gaseous space than necessary to produce effective combustion.

The defendants overstate the argument, urging invalidity of the product patent by contending that Korver adopted all the essentials of the Ostermeier patent, and merely substituted van Liempt's wire for Ostermeier's crumpled foil filling. The term "undulated" in Korver means something more than the crumpled condition of the foil shown in the Ostermeier patent. It appears that the undulations result from the internal strain designedly imparted to the wire before the material is introduced into the bulb. The quality of internal strain is referred to in the specification as a property of thin wires. Korver states: "As a rule, such thin wires inherently have sufficient internal strain to assume the desired curling upon entering space, and to permanently retain such curling." Korver must, of course, be charged with the dis-

closure in van Liempt's patent of just such a thin wire and its properties.

The situation may perhaps be summed up as follows: Korver recognized the limitations of the Ostermeier General Electric lamp. Likewise he found it necessary to effect a different distribution of the van Liempt wire than is disclosed in the van Liempt patent. He overcame both of the limitations by using the method defined in the method patent. In consequence a bulb was produced which was superior in properties to anything which the prior art knew. Now, of course, it is fundamental patent law that mere change in form of the old material does not constitute invention. On the other hand, when the change in material and in form results in a product possessing functions superior to those theretofore known in the art, the inventor has made a contribution which deserves patentability. See United Shoe Machinery Corporation v. E. H. Ferree Co. et al., 2 Cir., 64 F.2d 101, 103, certiorari dismissed, 290 U.S. 708, 54 S.Ct. 129, 78 L.Ed. 608. In this case the court held valid a patent which depended upon substitution of aluminum alloy for cast-iron arms used in clicking machines for manufacturing shoe uppers. The court said: "To be sure substitution of material may not amount to patentable invention, but the facts of each case must determine whether or not it does. The use of one material instead of another in constructing a known machine is in most cases so obvious as a matter of mere mechanical judgment as not to be inventive thought, but it can amount to invention if some new and useful result or increase of efficiency and decided saving in the operation is clearly obtained."

Judge Learned Hand observed in H. K. Regar & Sons, Inc. v. Scott & Williams, Inc., 2 Cir., 63 F.2d 229, 231: "When old devices are changed at all, the change may be dictated by a new conception, which it took originality to conceive. Strictly, the old device is not then put to a new use; the new use begets a new device. In such cases it requires but little physical change to make an invention."

Korver's contribution is not that of mere mechanical skill. He achieved more than

an improvement in degree of usefulness of an old product. His was the creation of a new kind of photo-flash lamp.

■ It should be added that though recognizing the fact that commercial success may often fallaciously be attributed to alleged novelty and invention, in this case it does appear that the Wabash Corporation was the first to embody a mechanical process for filling a bulb, and apparently produced as a result a better lamp than the art had known. The record shows that thereafter the General Electric Co., which had been the first manually to fill wire lamps, came around to mechanical means, and their sales have increased ten-fold over the peak volume of sales of the old abandoned foil lamp. As to the Wabash lamps, in 1936, when they were manufactured by the Korver process, the General Electric Company manually filled foil lamps were selling about three million a year. The Wabash lamps had risen to over a million in sales in 1937, while the sales of the General Electric Ostermeier lamp were about four million that year. In 1938 the Wabash lamps passed the sales of the General Electric, and in 1939 Wabash sales were up to seven and a half million. In 1941 they reached the total of seventeen million.* During this period sales of General Electric foil lamps had dropped, in 1939, to less than a million, and their production was discontinued in 1941. The General Electric Company then placed on the market other types of lamp, all manually filled, but it was not until 1941 that it adopted a mechanical process which enabled it successfully to compete with the Wabash lamp. I think then, under the authority of Goodyear Tire and Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, at 279, 64 S.Ct. 593, 88 L.Ed. 721, and the cases cited therein, the element of commercial success cannot be ignored in this case. I conclude, therefore, that the product patent is valid.

■ In the matter of infringement, the defendant seeks to avoid infringement on the contentions that shredded foil is not wire; that the shredded foil is not undulat-ed; and that it is not elastically supported from the wall.

Defendants' strips of shredded material, however, do fall within the meaning of the term "wire" as used in the Korver patent. Korver, in his specification, makes that entirely clear. He writes: "By 'wire', as used herein, is meant not only metal wires, but also glass wires, artificial silk wires and the like."

So also is the defendants' wire "undulated". Again referring to the Korver specification for a definition of that term we find: "The term 'undulated wire', as used in the claims, is to be understood to mean a wire which per se is provided with undulations, e. g. kinks or waves."

Applying this definition to one of the alleged infringing photo-flash lamps, Plaintiffs' Exhibit 8, it is very obvious that, as Mr. Anderson, plaintiffs' expert, testified, "The tips of the waves of the combustible are in contact, as you can see as you rotate the bulb, with the inside surface of the bulb, and the material in the lamp is curved and wavy all through the bulb." The only possible doubt then in respect to the charge that the defendants employ undulated wire in the sense in which the term is used in the claims, would arise from the use of the term "per se" in the quoted passage from the specification. But I take it that "per se" means nothing more than wire which of itself has the inherent capacity to be curled or undulated, and it is of no importance whether the wire acquires the undulated shape before or after it is propelled into the bulb. So I think it is fair to conclude that the defendants' wire is undulated within the fair meaning of the claims of the patent.

The final point is whether the shredded foil of the challenged tube fillings is elastically supported from the wall. Again looking at Exhibit 8, we find contact of the filling with the tips of the waves of the filling, as Anderson said, with the inside surface of the bulb. It cannot be that the defendants can escape infringement because the commercial adaptation embodies the use of

* Post-war sales after 1948 were in excess of 60 million.

732

lacquer on the inside surface of the bulb. Despite that surfacing it is still the glass wall which renders the support. That must be true even after giving full force and effect to the testimony of Noel, defendants' expert. He was asked in direct examination what the purpose of the lacquer was, and he answered: "It serves two purposes in each case. It imbeds the points of the shreds, and it prevents the flying particles of heated metal from cracking the cold and brittle glass."

In cross-examination Noel was asked to state his understanding of the purpose of the elastic support described in the product patent. He answered in substance that Korver wished to provide a wire filling which would be uniformly distributed and "supported by the bulb by its elastic strain, and also loops provided opportunities for catching and matting".

It may well be that because of the difference in a method employed by the defendants, as was described in a consideration of the process patent, the elastic support inherent in the wire as it takes position in the bulb is somewhat less than that disclosed in plaintiffs' Korver wire lamps. However, when all is considered, it would seem that plaintiffs' witnesses Parker and Anderson are correct in maintaining that even with the lacquer coating on the inside of the bulb, the filling in the challenged tubes is elastically supported from the wall within a fair range of interpretation of the Korver product patent.

Defendants also press arguments which in the nature of the case have no bearing in my judgment on the issue of infringement. They say, for example, that Korver instructs that a low pressure of the gas should be used, whereas the General Electric uses a much higher pressure; that Korver used the van Liempt alloy, whereas General Electric uses pure aluminum; that the Korver wire is stronger than the shredded foil of the General Electric; and finally that the Korver primer is different from that used by the General Electric.

The plaintiffs may have a decree in conformity with the foregoing opinion.

Appropriate findings of fact and conclusions of law will also be filed.