### SCOTT & WILLIAMS, Inc., v. ARISTO HOSIERY CO., Inc.

(District Court, S. D. New York. July 3, 1924.)

**Patents ⬅️328—1,233,714, for stocking, held void for lack of invention.**
The Scott patent, No. 1,233,714, for a tubular knit stocking having mock "fashion marks" in imitation of those in flat knit full-fashioned stockings, *held* void for lack of invention, in view of the disclosures of the prior art.

In Equity. Suit by Scott & Williams, Inc., against the Aristo Hosiery Company, Inc. Decree for defendant.

See, also, 266 Fed. 382.

Charles Neave and Hubert Howson, both of New York City, for plaintiff.

Frederick L. Emery and Irving U. Townsend, both of Boston, Mass., for defendant.

LEARNED HAND, District Judge. Machine-knitted stockings are made in two ways: One, upon a battery of needles extending in a single straight line; the other, with the needles arranged in two such lines or in a circle. The first way results in a flat web of irregular vertical borders, more vertical rows or "wales" being allowed at the calf and knee than at the ankle. The resulting inequalities in width, when the borders are sewed together, make a stocking of varying circumference, which will accommodate the leg as it broadens or narrows. This narrowing by the elimination of vertical rows is called "fashioning," and the resulting stocking is spoken of as "full-fashioned."

The other stocking is called seamless, and is truly such, since the circular, or double linear, battery of needles knits the horizontal rows or "courses" without gap or break around the whole leg, and produces a tubular web. It is possible to diminish the "wales" of a seamless stocking as the knitting goes from knee to ankle, but apparently it is

impossible while doing so to attain the speed which brings economy of production, so that in practice the seamless stocking is made with the same number of "wales" all the way down to the heel. The absolute uniformity of circumference which would otherwise result is, however, somewhat modified by a change in the length of the loops from one part to the other. Thus, at the knee and calf, the loops are made much longer than at the ankle. When thereafter the stocking is pulled laterally, the longer loops give, allowing a greater extension than at the ankle. There is some proof that this difference disappears or becomes less with time and washing, but the issue so arising I do not think it necessary to decide.

There is no question that the seamless stocking has never been able to take its place beside the "full-fashioned," and indeed it is this fact which has caused the suit at bar. Whether its failure to gain equal favor is due to prejudice or to defects as an article of wear makes no difference in the result. Women have come to associate the seamless type with a worse grade of stocking. Notwithstanding this, the seamless stocking has sold in large quantities; the necessity for thrift apparently prevailing over prejudice, or the genuine inferiority of the seamless stocking, or both.

The "full-fashioned" stocking has a seam up the back, made necessary when the flat fabric is rounded to a circumference. Furthermore, where the "wales" disappear as one knits from calf to ankle, an irregularity in the knit appears. This occurs whenever two "wales" are carried over to adjacent needles and thereafter disappear. It might have been possible to accomplish this by letting the unnecessary "wales" fade into each other at the back seam itself, so forming a series of "V's" down the back, as in the case of men's woolen stockings; but such has not been the practice, probably because in fact or in fancy this would result in weakening the seam, or in making it more troublesome to knit the edges solidly. Hence there are left a number of "wales," generally four, which continue from knee to heel at each vertical edge of the flat fabric. These are called "bordering wales," and it is into these that the disappearing "wales" sink or melt in succession as the width of the flat fabric narrows.

All this results in a characteristic appearance to the "full-fashioned" stocking, no part of which the seamless stocking should structurally have. Along the back of the leg runs a seam, and on each side of the seam appears a series of irregular dots in the knit or weave, generally about six or eight in number, where, as I have described, the vanishing "wales" are ended upon the "bordering wales." Both these features are really blemishes, since they represent a technical incompetence of the art to make a stocking of uniform texture everywhere, which shall be shaped to follow the sinuosities of the leg from ankle to knee. An ingenuous observer might have supposed that wearers would have welcomed their elimination.

Such a one would, however, fail to reckon with that principle of our nature which makes us wish to appear more affluent than our purses allow, and since, as I have already said, the seamless stocking has become associated with cheap apparel, those who are regretfully forced

to accept the cheaper grade welcome whatever will protect them from acknowledging their inability to follow the most elegant. In respect of the back seam the art has for long, indeed for over 55 years, come to their relief by providing a mock back seam in the seamless stocking, which can be added without substantial weakening of the fabric and by a simple technical device.

So matters stood for many years, the impecunious being contented enough with the subterfuge so provided to buy seamless stockings in great quantities. About 1912 the fashion in women's skirts changed to a much narrower cut. When the wearer was forced to step up, the lower leg was necessarily exposed much higher than it had been, showing the "fashion marks" of the "full-fashioned" stocking. Thus, observant and invidious members of the same sex had the opportunity to detect the innocent contrivance of the mock seam which had theretofore been successful, but which could now be discovered by the absence of the accompanying "fashion marks." Scott's patent, which was applied for in November, 1915, was merely to add such "fashion marks" to the seamless stocking, by incorporating into the weave or knit one of several well-known structural irregularities with which the art was entirely familiar. The claims I will not even consider, since the defendant acknowledged infringement. The whole case comes to this: Whether it was invention at that time to contrive the idea and properly to embody it in an actual patent application. The art concededly offered all necessary means to put it into execution, as the patent recognizes, which assumes the reader to be already familiar with how the invention can be practiced.

That the idea, once so conceived and so embodied, became an enormous success, was amply proved. Both sides testify to the fact that at the present time no seamless stockings can be sold without mock "fashion marks." The suit, indeed, goes to the very existence of the defendant's business, which consists of manufacturing machinery for making such stockings. An attachment accompanies these machines by which the mock marks can be made, and without which the machines could only make seamless stockings of uniform texture, except at the mock seam. To such an extent has the invention become a condition upon the acceptance of such stockings at all. This point the plaintiff especially presses, insisting that there is no better evidence of invention than an apparently simple device, theretofore unknown, which, when once discovered, every one wants. What, it asks, can be a better definition of invention than exactly the history of the art in the case at bar? The fashion came into existence three years before Scott filed his application, and for that period nobody thought to add that feature, which, when once Scott found it, all women insisted upon having. As Mr. Neave most persuasively put it, if one were looking for the very definition of invention, one could not ask for a better illustration.

I cannot deny the strength of the argument, to which, if there were nothing more in the case, I might feel forced to yield. But the art shows that, just as the mock seam had been known earlier, so was the mock mark. The nearest approach to Scott was in Ward's British patent of 1897. That was primarily for the manufacture of a stocking,

half seamless, half seamed. The upper part, down to where the stocking was to be fashioned, was made seamless, but Ward had the notion of fashioning the tapering part by a new mechanical process. Down to the calf, where the leg begins to narrow, he retained all the "wales," and the stocking was a cylindrical, seamless tube of uniform diameter. From that point, however, he did not knit all around the circumference, but by reciprocating his machine left out a part of the weave, larger and larger as he approached the ankle. Thus the back of the stocking had an open gore in it, made because the "wales" were omitted in increasing numbers, just as they are in a flat knit web. There were, however, no "bordering wales" at the edges of this gore, and obviously there could not be. The stocking had to be sewed at this part of the back, and a seam appeared where the "wales" met in a series of "V's," like men's woolen stockings, as I have already observed. In short, the stocking had the appearance which a "full-fashioned" stocking would have had, if the "bordering wales" were omitted, and there were no seam at the back of the upper calf.

Ward was apparently not content with the true seam from the swell of the calf to the heel, and so prescribed a series of what he calls "markings * * * in imitation of the widening or narrowing marks on goods fashioned on straight bar knitting machines" (page 5, lines 15–17). These, then, were meant to give the appearance of a flat knit stocking, and incidentally, though the point is of no importance, they were made with tuck stitches, one of the ways prescribed in the patent. They were as much mock marks as Scott's, and the only substantial distinction which can be taken between them and his is that they were made upon a stocking in which the number of "wales" was not constant, and in which there were no "bordering wales." It is these distinctions which the plaintiff presses most confidently.

They appear to me too tenuous to serve. Admitting that it might be a good invention, if out of the blue one conceived spontaneously the idea of putting mock marks where the necessities of the weave did not create them, there was no originality, after one man had arrived at such an idea, in transferring them from a partly fashioned stocking to a seamless. Their purpose was precisely the same in each case; that is, to give the false appearance of a structure which did not exist in the actual stocking, but which simulated the structure of the better grade. That purpose was the only thing that could show any originality at all, and, once disclosed, I cannot think that there was any difference, whether it was used upon one kind or the other.

To the argument that the art, with Ward's patent before it, had not made the change for three years after the fashion in skirts began to call for further deception, I answer that this was not a long time between occasion and discovery. Fashions appear and disappear rapidly, and it is reasonable to expect a certain lag in the accommodation of subsidiary arts, not because invention fails, but because adaptations in a settled industry are costly, and, if the fashion disappears, wasteful. Three years is not a long time to wait for the appearance of a simple expedient supplementary to what might have been a passing mode of dress. I cannot quite take seriously the notion that, had Scott seen

300 F.—40

Ward's patent, it would have been invention for him to apply this detail to a completely seamless stocking. The most I can allow to him is such ingenuity as is involved in recognizing that Ward's mock marks might become popular, after the fashion arose to show more of the stocking. Yet I must judge what he did as though he had before him all the relevant art. While, therefore, I agree that the disclosure is not a complete anticipation, I think Scott's application of it was not far enough removed to support a patent.

Again, while they are not so close as is Ward, it seems to me that the disclosure of Hancock's British patent of 1874, and more especially that of Robert W. Scott's two earlier patents, 789,635 and 897,496, are relevant, as showing how easily closely similar simulations occurred to persons working in this field. As I have already said, it is technically possible to manufacture a seamless stocking which shall also be truly fashioned to the leg, but apparently the process is too imperfect to allow it to compete with flat knit stockings at the necessary difference in price. Such fashioning is accomplished by leaving out a "wale," or a couple of "wales," at a time, and sinking them into the "bordering wales," which are carried from knee to heel precisely as in the flat knit. Where the "wales" so disappear, an irregularity will arise of exactly the same kind as in flat stockings and for exactly the same reason, as strictly structural as in the flat.

However, in all three of these patents these marks are not at the back, where normally one would expect them. They appear in two rows, on either side of the rows of what in flat stockings would be "bordering wales," but which in these seamless stockings border nothing, and merely form parts of continuous circular "courses." Scott, at least in his later patent, 897,496, put in these "bordering wales" to imitate the same feature of the flat fashioned stocking because he expressly said so. Thus (page 1, lines 10–14) he says that the object of his invention was to make a stocking "with shaped calf portion having a band resembling the bordering wales which are present in the calf portion of a stocking made from a flat fashioned web." Again, (page 2, lines 54–56) :

"The fashioned portion of my improved web presents the same appearance as that of a web fashioned on a straight machine"

—with an exception not necessary to note. There appear to have been no technical difficulties in omitting the "bordering wales" altogether. They were added because they made the stocking look like a flat knit stocking. True, the stitches were functional, but it seems to me a very short cry from adding such "bordering wales," for the purpose of imitating a flat stocking, by separating the fashion marks, to adding mock marks when the knit does not make them. I agree that the disclosures are further away from the patent in suit than Ward's, but at least they show that the idea of imitating the better grade of stockings in respect of their fashion marks was old on November 2, 1915. Is it very important that in 1874 and 1904 and 1906 true fashion marks were fixed at a spot where they would deceive, while in 1897 and in 1915 mock marks themselves were added?

I conclude, therefore, that the art already showed all that this simple patent discloses, not, it is true, in exactly this kind of stocking, but

so nearly that no one could claim any originality in the change. After all that has been written, and will be, of any tests of invention, there must always remain some latitude which is not susceptible of nice rational analysis. The standard is too impalpable to permit of strictly deductive application; in the end, a judge in this as in many other fields will to some extent reach his conclusions for reasons of which he may not be wholly aware, and which may depend upon his unconscious preference. This patent appears to me to be a trivial variation upon an old theme. One can scarcely expect unanimity as to how substantial it may appear to others, but one must judge as one can, and rightly or wrongly the conclusion seems to me very clear.

The bill must be dismissed for invalidity, with costs.