## H. K. REGAR & SONS, Inc., v. SCOTT & WILLIAMS, Inc.

### No. 214.

Circuit Court of Appeals, Second Circuit.

Feb. 14, 1933.

Howson & Howson, of New York City (Charles Neave, H. A. Howson, and Hubert Howson, all of New York City, of counsel), for appellant.

John M. Cole, of New York City (Joshua R. H. Potts, Eugene Vincent Clarke, and Basel H. Brune, all of Chicago, Ill., and T. Bertram Humphries, of Philadelphia, Pa., of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The patent in suit is for a method of producing a scalloped edge at the top of knitted "seamless" stockings. The application included such edges both when folded over and unfolded, but the patentee was unsuccessful in securing claims for the second feature, and we are therefore concerned only with the first. "Seamless" stockings are woven all around so as to make continuous tubes; more expensive, and therefore more elegant, stockings are woven flat, and sewn together at the back, showing a seam; these are called "full-fashioned." We have already had occasion to discuss the two kinds before, though in quite another connection, and may refer to our opinions for fuller details. Scott & Williams, Inc., v. Aristo Hosiery Co. (D. C.) 300 F. 622; Id. (C. C. A.) 7 F.(2d) 1003. A "wale" is a vertical row of loops; a "course" is a horizontal row. It is not possible in a "seamless" machine to transfer a stitch from one "wale" to another; nor is it possible to make a "tuck" stitch on a "full-fashioned" machine, that is, a stitch in which a "long latch" needle picks up several "courses," and holds and loops them so as to leave an opening in the fabric. Thus, "tuck" stitches are forbidden in "full-fashioned" stockings, and "transverse" stitches in "seamless."

The specifications provided for "tuck" stitches, but these were not new, and no patent could rest upon them; they are the means by which "open-work" is introduced into "seamless" stockings, and there had been "open-work seamless" stockings before. The patented scallops are to be made in two ways, each caused because "tuck" stitches draw the yarn unduly and create a pucker or distortion in the adjacent "wales," in which the knitting is close, even and solid. When the "tuck" stitches occur at the edge of the stocking, they draw down the yarn and make the valleys of the scallop; the adjacent "wales" bulge upward making the hillocks. This was the form for which the patentee failed to get any claims. If however a transverse line of "tuck" stitches is made in the body of the stocking, alternating with solid and close knit "wales," these last will bulge out from the circumference. If the end of the stock-

ing is then turned over on the transverse line of the "tuck" stitches, the outward bulges, containing the regular "wales," will show above the "tuck" stitches, and the edge will be scalloped, just as when there is no turn over or hem. This last form is the patented invention.

There is an ambiguity in the disclosure as to just what was the "tuck" stitch employed by the patentee. He seems to have intended an extra long stitch with extra tension at the line of the fold. Thus he says (page 2, lines 44–46), "there is a group of long stitches in either end of the formation and a very long stitch at the centre." He is speaking of a vertical stretch of "open-work," extending above and below the transverse line on which the turn is to be made. Again (page 2, lines 49–58): "The long latch needles will make three of the long stitches shown in Fig. 2, then a stitch considerably longer, and then three more long stitches. The severe tension on the yarn forming the longest stitch tends to wrinkle the fabric alongside the centre of the formations of open-work so that, when the cuff (is) turned over as shown in Figure 4, scallops 22 are produced." Although the claims relate only to "cuffs," they do not contain as an element the "very long stitch," which creates the "severe tension on the yarn." It may well be that they should be read eo intuitu, and if so, they may be valid. We shall so assume for argument, because the plaintiff did not prove that the defendant's stockings had any "very long stitches," or any tension beyond that common in the art. By a "long stitch" the disclosure clearly means a stitch which takes up at least three "courses" (figure 2), with corresponding tension; therefore, a "very long stitch" must take up more, and create "severe tension." So far as appears in the record, the defendant does not use any longer "tuck" stitches or any severer tension than those in the Wilson stockings, of which we shall speak in a moment. Unless therefore the claims are to be read more broadly, and cover more than "very long tuck stitches," the defendant has not been shown to infringe. We consider their validity on the assumption that they cover "long tuck stitches" as well.

The defendant proved the manufacture of certain stockings made at least as early as 1917, nearly ten years before the application was filed, manufactured by one, Wilson, which completely anticipate the claim, if broadly construed. These were "seamless" stockings having vertical "open-work" ribs, all their length, alternating with similar solid knit ribs. The "open-work" ribs occupied a number of "wales," and so did the solid, but the specifications clearly contemplated that the width of the ribs and the depth of the scallops should be at the option of the weaver. Again we quote from the patent (page 2, lines 19–33): "In producing the stocking illustrated, I place one long latch needle between groups of five short latch needles, and each long latch needle makes one stitch to four stitches made by the short latch needles until it has made three long stitches. * * * However, it is evident that reasonable variation may be made in the relative number of long and short latch needles, the number of stitches dropped, and the number of long stitches made, in order to produce different shapes and sizes of scallops and formations of open-work." The Wilson stockings were turned over at the top so as to form a hem, and the edge so made was a definitely scalloped line, caused by the distortion of the solid knit ribs by the "tuck" stitches in the open-work ribs. This is best shown in Exhibit J; it is also shown in Exhibit I. Objection is made to the last because of what is called the "spiral effect"; the hem has apparently been carelessly turned over; at any rate each rib is not brought down vertically so as to be sewn against itself. This does not however prevent the edge from being plainly scalloped, though not so noticeably as Exhibit J. There is some dispute also as to whether the "spiral effect" may have in part been due to the spinning of the yarn, but that also is immaterial. Each exhibit embodies all the elements of the claims if they cover the supposed infringements.

The specifications do not indicate that the tucks are to be only on the transverse line, but perhaps the claims should be so read. Moreover, one of the stated objects of the invention is so phrased as to lend itself to that interpretation (page 1, lines 22–27). If so, it is true that the Exhibits I and J do not anticipate in that respect. But the figures do not suggest any such limitation, and it is clear that the patentee conceived his invention as more comprehensive. We need not hold that the application might not be so circumscribed during prosecution; in view of the statement at the outset perhaps it might. Once, however, the idea was conceived of making a scalloped edge by tucks at the turnover, there could be no invention in tucking only on the line where the scallops were to appear. That was certainly a matter of the taste of the wearer, who might prefer to have the whole body of the stocking close knit, or

have stripes of "open-work" appear, more or less extensive. The patentee cannot rest his invention upon such a narrow difference.

The plaintiff answers that the effect was not intended in the Wilson stockings, and that the invention was not therefore anticipated. It is quite true that an accidental use will not anticipate a process, if the earlier practiser was not aware of what he was doing, or how he did it. His work must give some assurance that the result can be reached another time, and of this there can be none unless the process is deliberate and the means understood. Nothing else can be called an art; it is merely an accident. Tilghman v. Proctor, 102 U. S. 707, 711, 26 L. Ed. 279; Eibel Co. v. Paper Co., 261 U. S. 45, 66, 43 S. Ct. 322, 67 L. Ed. 523; Hillard v. Fisher Typewriter Co., 159 F. 439 (C. C. A. 2); Morgan Construction Co. v. Wellman, etc., Co., 18 F.(2d) 395, 399 (C. C. A. 6); Pyrene Mfg. Co. v. Boyce, 292 F. 480, 485, 486 (C. C. A. 3). But when the result is a necessary consequence of what was deliberately intended, it is irrelevant that it was then valueless for the purposes in mind. Were that enough to prevent anticipation, it would be possible to patent a new use for an unchanged process; which is never true. Roberts v. Ryer, 91 U. S. 150, 159, 23 L. Ed. 267; Ansonia B. & C. Co. v. Electrical Supply Co., 144 U. S. 11, 18, 19, 12 S. Ct. 601, 36 L. Ed. 327; Schreiber & Sons v. Grimm, 72 F. 671, 675 (C. C. A. 6); Wayne Mfg. Co. v. Benbow-Brammer Co., 168 F. 271, 277, (C. C. A. 8); In re Smith, 36 F.(2d) 302 (Cust. & Pat. App.); Leander Dev. Corp. v. Taft-Buick Corp'n, 42 F.(2d) 823, 826 (C. C. A. 2); Friend v. Burnham & Morrill Co., 55 F.(2d) 150, 153 (C. C. A. 1). Cases like Topliff v. Topliff, 145 U. S. 156, 12 S. Ct. 825, 36 L. Ed. 658, and Potts v. Creager, 155 U. S. 597, 608, 15 S. Ct. 194, 39 L. Ed. 275, are to be distinguished. When old devices are changed at all, the change may be dictated by a new conception, which it took originality to conceive. Strictly, the old device is not then put to a new use; the new use begets a new device. In such cases it requires but little physical change to make an invention. Traitel Marble Co. v. Hungerford B. & C. Co., 18 F.(2d) 66, 68 (C. C. A. 2); H. C. White Co. v. Converse, 20 F.(2d) 311, 313 (C. C. A. 2). But a new use of an old thing or an old process, quite unchanged, can under no circumstances be patentable; not because it may not take as much inventiveness to discover it, as though some trivial change were necessary, but because the statute allows patents only for a new "art, machine, manufacture or composition of matter" (section 31, title 35, U. S. Code [35 USCA § 31]). The test is objective; mere discovery will not do. In the case at bar it is indeed hard to find even a new use; perhaps it would be more accurate to speak of a use for what had theretofore been thought useless. But the result is the same; it is final that the patented process, if broadly conceived, had been deliberately practised before. If later, women came to prize a scalloped edge, it was not possible to monopolize it by claiming as an invention the discovery that they prized it.

There can be no question of the adequacy of the evidence. The very stockings were produced by witnesses who had had them in their possession since they were made, backed by their testimony, which there is no reason to challenge. The case is not one where we must rely upon the recollection of events long past; unless the witnesses, apparently unbiased, were perjured, the stockings were made long before any date material to the controversy.

Decree reversed; bill dismissed for noninfringement.