51 CCPA
**Application of Thomas C. MORRIS (deceased) and Eric C. Johnson.**

**Patent Appeal No. 7005.**

United States Court of Customs and Patent Appeals.

March 12, 1964.

Rehearing Denied June 18, 1964.

Rich and Smith, JJ., dissented.

Dos T. Hatfield, Washington, D. C. (Merwin F. Ashley and Wm. W. Rymer, Boston, Mass., of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (George C. Roeming, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

MARTIN, Judge.

This is an appeal from a decision of the Patent Office Board of Appeals affirming the examiner's rejection of claim 24, the only remaining claim in appellants' application serial No. 377,162, filed August 28, 1953 for THERMOPLASTIC ADHESIVE RODS OR STRIPS.

Claim 24 reads:

"A package of solid flexible thermoplastic adhesive in coil form, said coil comprising a plurality of turns of rod of substantially uniform cross-section, said rod being formed of a thickness of between about $\frac{1}{8}$ and $\frac{1}{2}$ inch of a normally solid, flexible thermoplastic mixture of at least two ingredients at least one of which is a normally solid, thermoplastic, synthetic polymer, said mixture being fluid with a viscosity suitably low for adhesive application at temperatures in the range of 250° F. to 400° F., the physical properties of said rod including the characteristics that said rod is self-supporting, dry, non-tacky, flexible and sufficiently hard to be coiled for storage and uncoiled for use as needed without cracking, said rod being sufficiently stiff to be capable of being fed from said coil and being reducible progressively and rapidly by heat in said temperature range to a fluid condition in quantities as needed for use in a direct through feed industrial cement applying and dispensing system."

Appellants' application describes a coil of solid, self-supporting, dry, non-tacky, flexible thermoplastic adhesive rod formulated to be fluid in the range of 250°F. to 400°F. The coil is described as for use in a heating and dispensing device in which it is heated to a viscous state and applied to articles to be adhered together. Appellants contend that such use eliminates the need for a molten adhesive reservoir.

The references relied on are:

Price 1,923,456 Aug. 22, 1933
Sussenbach 2,510,727 June 6, 1950
Shonberg 2,557,574 June 19, 1951
Alien Property Custodian Application of Dumont, Serial No. 352,-364, Published April 27, 1943.

Dumont describes the production of shaped structures, such as filaments, rods, tubes and the like from moldable synthetic resins, by extruding the shaped structures in a plastic, liquid or dissolved state from a nozzle rotating quickly around its axis, and finally cold drawing said structures in the direction of the extrusion. In one embodiment of Dumont, a filament "consisting of thermoplastic synthetic resins" is extruded from a nozzle rotating in bearings. The extruded filament is then wound in coils on a cylinder rotating in bearings with a higher peripheral speed than the corresponding extrusion velocity. Dumont teaches that synthetic resins, preferably those possessing a linear structure of the polymeric molecules, may be extruded with a resulting orientation effect which greatly improves their tenacity. Dumont considers this especially true "for the superpoly-condensates * * * such as the superpolyamides and polyamide condensation products which are obtainable either from dibasic acids and dibasic amines or from aminocarboxylic acids and their lactames." [1]

Price discloses a package for enclosing ribbon-like products, such as wire, wire solder, tape and the like. The package includes a spool member, and a wrapper for encircling the ribbon-like products wound on the spool.

Shonberg discloses wrapping solder wire or other flexible material helically around a core member, the core member forming the body of a spool.

Sussenbach discloses a sealing composition containing a tacky, adhesive, plastic resin bonding material, chrysotile, an electrical conducting material and an organic polar solvent. In use, a round bead of the plastic sealing composition may be extruded along the margin of a metal plate, another metal plate brought into engagement with the bead, and welding electrodes applied at spaced points along the metal plates. The pressure of the electrodes forces the plates toward one another and squeezes the bead flat. Upon the passsage of the welding current through the electrodes, plates, and sealing composition, the plates are squeezed closer together and become welded together.

The examiner rejected claim 24 on Dumont. He considered the coiled filaments or rods of Dumont to meet all the limitations as to appellants' thermoplastic material and took the position that Dumont's coiled filaments or rods obviously possess all the physical limitations defined in appellants' claim 24.

The examiner also rejected claim 24 as "lacking invention" over Sussenbach in view of Price or Shonberg. He regarded Price and Shonberg as showing flexible material which has all the physical properties of the material defined in claim 24 formed into rod shape and wound into coil form and concluded that "no invention" would be involved in winding the "rod of Sussenbach" into coil form.

---

1. The Patent Office and appellants have characterized such condensation products as "nylon." Nylon is defined in the Concise Chemical and Technical Dictionary (H. Bennett ed. 1947) as the "Generic term for any long-chain synthetic polymeric amide which has recurring amide groups as an integral part of the main polymer chain, and which is capable of being formed into a filament whose structural elements are oriented in the direction of the axis."

The examiner further rejected claim 24 as lacking invention over Price or Shonberg in view of Dumont or Sussenbach. The examiner could find no "invention" involved in substituting the material of Dumont or Sussenbach for the material in Price or Shonberg, thereby providing a coil of adhesive rod. The examiner made reference to the Fibers Chart in "Modern Plastics"—Encyclopedia issue, Sept. 1956, at pages 514 and 515, to show that nylon in filament form "becomes sticky as [sic] 400–455°F which is comparable to the temperature limitations in the claim." He also considered nylon to be flexible and took the view that, since size is not a matter of "invention," the dimensional limitations in claim 24 have no effective force.

The Board of Appeals found no error in the examiner's decision in rejecting claim 24 over (1) Dumont, (2) Sussenbach in view of Price or Shonberg and (3) Price or Shonberg in view of Dumont or Sussenbach.

In sustaining the examiner's rejection of claim 24 on Dumont, the board stated that "Webster's New International Dictionary defines 'adhesive' as—sticky" and that therefore Dumont's material may be 'adhesive' at 400°F." The board further referred to pages 174–175 of "The Technology of Adhesives" by John Delmonte (1947) as "showing the use of nylon as an adhesive to be old, specifically as safety glass interlayers and for shoes, boxes, cloth, leather, wood and glass." The board considered that Dumont's references to " 'filaments, rods * * * and the like' would suggest to one working in the art a flexible member of the thickness of about ⅛ to ½ inch particularly when viewed with Shonberg."

The issue facing this court is whether the board was correct in affirming the examiner's ground of rejection of claim 24 as unpatentable over (1) Dumont, (2) Sussenbach in view of Price or Shonberg and (3) Price or Shonberg in view of Dumont.

Dumont discloses synthetic resins in the form of shaped structures such as filaments and rods. In a specific embodiment, Dumont shows a solid thermoplastic synthetic resinous filament being wound in a coil on a cylinder. Thus we think it clear that Dumont suggests winding thermoplastic synthetic resinous rods in coils on a cylinder and would therefore suggest a rod in coil form as set forth in claim 24.

Appellants urge that their reference to a package of "adhesive," the fluid limitation and the size recitation result in structurally distinguishing claim 24 over Dumont.

Dumont teaches that the "superpolycondensates" may be formed into his shaped structures. Such "superpolycondensates" are exemplified as being "the *superpolyamides* and *polyamide condensation products* which are obtainable either from dibasic acids and dibasic amines or from aminocarboxylic acids and their lactams." [Emphasis ours.]

Although Dumont does not specify any particular polyamide nor indicate the fluidity or adhesiveness of a polyamide applicable for his invention, it is clear from the record that the use of polyamide condensation products for adhesives is old. The board referred to Delmonte's "The Technology of Adhesives," pages 174–175 (1947) as making such a showing. That reference, for example, teaches that a resin formed from triglycol diamine and adipic acid, which is soluble in water, alcohol, and dioxane, and melts at 185°C. is "of potential value to the field of adhesives." Such a resin is a polyamide condensation product and Dumont discloses polyamide condensation products. Furthermore, "The Technology of Adhesives" states that:

" * * * Carothers also describes safety glass applications of these polyamides [72] [2], and other readily soluble polyamides useful for coatings, packaging materials, and *adhesives*. Ethylene diamines are reacted with fatty acids from soybean

2. Footnote 72 refers to U.S. 2, 191, 556.

to form polyamides soluble in inexpensive solvents. They exhibit excellent adhesion to glassine paper, sulfite paper, lead foil cellophane, etc.[73] [3]." [Emphasis ours.]

As to the fluid limitation in the range of 250° F. to 400°F. the triglycol diamineadipic acid polyamide referred to in "The Technology of Adhesives" melts at 185°C., i. e., 365°F., which is within appellants' claimed temperature range.

Claim 24 does specify "a normally solid, flexible, thermoplastic mixture of *at least two ingredients* at least one of which is a normally solid, thermoplastic, synthetic polymer." [Emphasis ours.] However, claim 24 does not specify what the second of appellants' "at least two ingredients" is. As pointed out above, Dumont shows a normally solid thermoplastic composition which may be a superpolyamide or a polyamide condensation product and the record shows the adhesive use of polyamides, having a fluidity within appellants' claimed fluidity range, to be old. Thus, although Dumont does not show a thermoplastic mixture of at least two ingredients, we do not consider the mere requirement of "at least two ingredients," in the absence of any further language in the claim specifying what that other ingredient is, to patentably distinguish appellants' claim 24 over the Dumont patent. Furthermore, even though the majority of appellants' examples have at least two thermoplastic synthetic polymeric materials, appellants have indicated [4] that in one of their examples there is but one thermoplastic synthetic polymeric material present and that the "special combination of properties of the adhesive rod in solid and in heat softened condi-

tion depends on the presence of the synthetic polymer material in substantial proportion." As claim 24 reads, the second of appellants' "at least two ingredients" could be any type of material including a nonpolymeric material.

Remaining for consideration is the recitation in the claim that the rod is formed of a thickness of between about ⅛ and ½ inch. The Dumont reference does not disclose this particular size. However, we think it does suggest formation of a rod of synthetic resinous polyamides in coil form. We consider the thickness of the rods as only an obvious matter of choice.[5] There is, of course, nothing in the claim limiting the use of the claimed package to direct through-feeding into a heating and dispensing device. Obviously the package of adhesive may be used by cutting the rods into lengths and melting the lengths in a reservoir. The use of a molten adhesive reservoir has been described by appellants as old.

Since we consider that the appealed claim is unpatentable over Dumont, we find it unnecessary to consider the examiner's remaining art rejections.

For the foregoing reasons the decision of the board is affirmed.

Affirmed.

RICH, Judge (dissenting).

The legal problem of obviousness [1] in this case is a difficult one to take hold of. Not that the problem is ever easy to solve, but here it is particularly difficult because of the claim, which is a misfortune inflicted upon us by the U. S. system of claiming. When the issue is approached only from the standpoint of the limitations in the claim and their in-

3. Footnote 73 refers to an article in Modern Packaging, 17, 113 (May 1944).

4. An amendment filed July 23, 1954.

5. There is nothing in the record indicating any criticality in the specific limits of "⅛ and ½ inch." Appellants in the application state:
"The importance of maintaining only a minimum of adhesive in heated condition in combination with the importance of softening or melting the ad-

hesive rapidly when needed dictates that the thickness of the rod or strip shall be *relatively small, in general* from *about* ⅛ to *about* ½ inch in thickness." [Emphasis ours.]

1. It is my view that obviousness under 35 U.S.C. § 103 *is* the sole issue. The majority opinion uses the *expression* "unpatentable over" in affirming the examiner's rejection of "fully met by Dumont." However, the majority admits

dividual relation to elements of structure, thermal characteristics, packaging methods, and the like to be found in the references, one completely loses sight of reality, of what the applicants actually invented, and reaches a result, as the majority does, which may sound good and seem logical but which rather misses the only important point—whether what the applicants *invented* is something which would have been *obvious from the references*.

I wish, therefore, to approach the question from the standpoint of what they invented, as the record shows it, and thereafter consider how it is claimed and whether the claim defines, as well as may be, an unobvious invention. If this sounds like a peculiar approach, I would suggest that everyone familiar with this patent business knows full well that a claim considered by itself rarely conveys a clear idea of what has been invented and that the best way to arrive at an understanding of the invention is to compare the disclosure with the prior art and see what the differences are. The claim is then to be read in the light of the disclosure. I will start with the prior art.

Price and Shonberg disclose the conventional, well-known spools of coiled wire solder. Solder is not an "adhesive." Sussenbach discloses a sealing composition for welded seams the plasticity of which "is such that it may be readily extruded from an extrusion gun to form a round bead as it is applied * * *." In other words, it can be laid on the work like toothpaste or caulking compound. It cannot be spooled. It is not an adhesive. The adhering is done with spot welds. Dumont (the German national's application published by the Alien Property Custodian in 1943) is concerned with improving the "tenacity"—i. e., tensile strength (Webster's New International Dictionary, 2nd Ed., "4. *Physics*")—of any kind of "reversibly moldable"—i. e., thermoplastic—synthetic resin by a two-

fold mechanical working. Extruded articles such as filaments, rods, or tubes are, first of all, extruded through a revolving extrusion nozzle which tends to orient molecules in a circular direction and, secondly, the extruded article is drawn out linearly at a faster rate than it is extruded so as to orient molecules linearly. The disclosure is that the invention applies to "all synthetic resins possessing preferably a linear structure of the polymeric molecules." One part of the linear drawing mechanism is a cylinder on which the extruded article is wound as it is emitted from the extruder "with a higher peripheral speed than the corresponding extrusion velocity." Thus does one end up, possibly and temporarily, with a plastic rod "in coil form" as an incidental result of the drawing operation. Of course, the rod must be removed from the cylinder for use and its ultimate form is not disclosed. The reference says nothing whatever about adhesives and has no bearing on adhesives, their form, composition or handling. It deals solely with the molecular orientation of thermoplastics in general by mechanical working.

Dumont includes nylons among his thermoplastics and "Modern Plastics 1956" is cited merely to show that nylons are "sticky" at 400–450°F. and melt at about 415–480°F. (The majority opinion omits this reference but the solicitor did not.) The "Technology of Adhesives" reference discloses that certain polyamides (which "nylons" are) may possibly be of value in the field of adhesives, sometimes dissolved in solvents, sometimes as "hot melts."

One cannot find in the cited references any disclosure or any suggestion of an *adhesive* product, usable as such, in the form of a coiled rod. However, by the Patent Office reasoning a spool of nylon fishing line would meet the claim.

There is other "prior art" of which neither the majority nor the Patent Of-

to limitations of claim 24 which are *not* to be found in Dumont, combines another reference with it not used by the examiner, and eschews the "fully

met" language. It therefore strikes me Dumont must be treated as a section 103 reference. The other rejections are clearly based on section 103.

fice takes notice which has an important bearing on the issue before us. That is the prior art referred to in appellants' specification and elsewhere with respect to how the thermoplastic resin adhesive compositions were being handled in the field to which the invention pertains at the time appellants came forth with their invention. The patenting of inventions is of practical concern with reference to the promotion of the progress of useful arts and the one thing apparently given no consideration whatever by the examiner, the board, the solicitor, and the majority is the state of the relevant useful art and what the appellants did to it.

The specification points out, and it has not been disputed, that before the invention thermoplastic polymeric adhesive as used in machines employing and applying it [2] was heated in substantial quantity in a reservoir in the machine and pumped in a molten state to the point of application. This had several disadvantages. The reservoir had to be kept filled by the operator of the machine. An excessive quantity of adhesive had to be kept melted which also took too long a time to melt when a machine was started up. Continued heating had a deleterious effect on some hot melt adhesives, which decomposed. Cleaning out the reservoir was difficult and necessary whenever a change was made from one adhesive to another. These hot melt or "glue pot" adhesives, incidentally, were brittle compositions which were broken up into pieces to be fed to the reservoir and as such were not amenable to being made into the form of rod to be wound into a coil and unwound again for use.

Now against this art background, what was appellants' invention? It was *an entirely new concept in adhesive handling.* It was the concept of providing a solid polymeric type adhesive in the form of an elongated coilable rod of particular strength, flexibility, and fluidity

characteristics for a particular purpose, to be used in a non-existent machine which was to be developed to employ their novel concept, provided it worked out. As one of the inventors, Johnson, said in his affidavit, "At the outset, it was not apparent to either of us whether or not we could produce an adhesive formulation suitable for coiled rod formation and having the requisite properties." *After considerable research,* success was achieved and a patent application filed.

The patent specification reflects what was learned in the course of the research. One may conveniently divide the specification into three parts: the broad statement of the invention, the disclosure or discussion of the considerations to be met in carrying out the invention, and ten specific examples of exact formulations of adhesive compositions suitable for practicing the invention.

In the broad statement of the invention the appellants said: "This invention relates to a new thermoplastic adhesive article for direct through feed thermoplastic adhesive dispensing." So far as the record shows, this was a novel concept. "According to the present invention there is provided an elongated body of solid, thermoplastic adhesive constituting a self-supporting rod of uniform cross section for cooperation as supply and control with a heated softening and dispensing passageway having a complementary cross section." No such concept is disclosed in the references. "Compositions which have been completely outside of the field of materials which could be used for adhesives to be dispensed from a molten reservoir may be employed effectively in this special form." And further, "The thermoplastic adhesive rod constitutes a new tool with the aid of which a great many adhesive problems are solved." In no reference is there the slightest suggestion to utilize a thermoplastic resin adhesive in the form

2. The practical application of the thermoplastic adhesives appears to have been of practical concern primarily in shoe manufacture and in shoe manufacturing machines. The applicants were employees of B. B. Chemical Co., a wholly owned subsidiary of United Shoe Machinery Corporation, and employees of both companies jointly developed the invention before us and machinery for utilizing the rod-form adhesive, such a machine being shown in MacKenzie patent 2,762,716, of record.

of a coilable rod and the "new tool" characterization appears most apt. "The field of uses of the thermoplastic adhesive rod is extremely broad and a wide variety of rods of thermoplastic adhesive may be prepared for the various uses * * *." The breadth of the invention is summed up as follows:

"No serious limitations exist as to physical or chemical properties except that the rod be a thermoplastic adhesive composition, that it possess sufficient flexibility and resistance to fracture at operational temperatures to be coiled and uncoiled and that it be self-supporting and possess dimensional stability such that the rod or strip does not change during storage from the shape required for cooperation with the softening and dispensing passageway."

Following these general statements, the ten specific examples are set forth. In the variety of their formulations they demonstrate that the broad concept of the invention can be carried into practice in a wide variety of ways and support the general statement made in the specification that a skilled compounding chemist, familiar with the teaching of the specification, could produce satisfactory rods other than those specifically described.

The foregoing amply demonstrates the predicament of the applicants vis-à-vis the Patent Office which complains that the claim is "functional" in many of its limitations, which should therefore be ignored; that the temperature range stated for fluidity is not a "critical" range, whatever that may be taken to mean; that it is indefinite in "other ingredients" than the synthetic polymer; that it does not set forth "specific ingredients"; that Dumont's polymers are not distinguished from "in terms of chemical structure" and fail to set forth molecular weights of the components; and that there. is "no limitation as to the diameter of the coil."

If appellant's broad concept of coiled adhesive in rod form which is basically a polymeric thermoplastic resin is not protected by a broad claim, the practical result is that *it is not protected at all* because of the ease with which formulations other than those specifically disclosed could be devised, with which to enjoy the benefits of the invention without meeting the limitations of such a claim as the Patent Office appears to visualize as meeting its requirements. Therefore we are faced with a broad claim. Appellants would be fools to try for any other.

If we center our attention on the invention as described, it is apparent that it is *a broad invention nowhere suggested in the references.* But attention has been centered on the claim instead, read without much regard to the scope of the invention or the meanings of the terms in the claim construed in the light of the supporting disclosure.

The main rejection rests on Dumont alone and is based on two things: that it shows some nylon, possibly in rod form, temporarily rolled on the cylinder of a machine the real purpose of which was to stretch it as it came out of the extruder; and that another reference says nylon gets "sticky" if it is hotter than 400°F. (This was the Patent Office view and I appreciate that the majority abandons it for another of its own making synthesized from "Technology of Adhesives.") I feel that appellants are right in pointing out that the claim distinguishes from Dumont in its size limitation, in its "fluid" limitation, and in calling for a package of "adhesive" which becomes fluid in the range 250–400°F. It is clear to me that the board tacitly admits that Dumont teaches nothing about adhesives and further that it distorts the meaning of "fluid" to include that which is not fluid according to the common meanings of that word, so as to include that which is merely sticky.[3]

3. The solicitor's brief acknowledges that the board's position was that "fluid" in the claim "does not distinguish from the stickiness of nylon at 400°F." but obviously he did not relish the task of trying to support that position for no at-

In utilizing Shonberg's roll of solder in sustaining another rejection it also appears to me that the board distorts the common meaning of "adhesive" in contending that solder is an "adhesive, having all the properties as called for in the claim except containing synthetic polymer." As this court said in In re Dean, 291 F.2d 947, 48 CCPA 1072, claims are to be read in the light of the specification, not in a vacuum, and in the context of this case solder (i. e., *metallic* solder which is all the references disclose) is not an "adhesive" within the meaning of the claim.[4]

The acting board member, writing its opinion on rehearing (in which its first opinion's new rejection under Rule 196 (b) was wholly withdrawn), said that he "could go on and on with respect to the other 'properties' as claimed" and it appears to me that taking the approach that was taken this is no doubt true. I think, however, that the Patent Office had already gone "on and on" to too great an extent in synthesizing supposed suggestions for appellants' invention, as claimed, from the prior art where no such suggestions exist and in finding technical reasons for ignoring the plain meaning of the claim, properly read in the light of the specification, along with various claim limitations, so as to give the claim a semblance of *reading on* an entirely unrelated prior art disclosure.

Read in the abstract, claim 24 does seem, on first impression, to have some rather vague limitations. But read in the light of the disclosure as a bona fide effort to so define the actual invention disclosed *as to provide it with* adequate protection and at the same time do the necessary in *distinguishing in terms from the prior art* references, I would be at a loss to improve upon it.

I do not see any legal compulsion for us to present appellants with the choice of having no protection at all, which results from the majority opinion, or entirely inadequate protection, which would result from acceding to the unjustifiable requirements of the Patent Office in this case.

There is more than adequate precedent in the prior opinions of this court, many of which are referred to in the dissenting opinion of Judge Smith, for approving a claim such as the one before us on the ground that unobviousness may be predicated on a *broad novel concept* for doing a thing though the *means* for doing it, once the concept is given, may seem quite simple in view of prior art viewed with hindsight perception. Of course the claim must distinguish *in terms* from the prior art, but that it amply does if what it says is heeded.

I fully agree with appellants' conclusion which says:

"We submit that this is one of those cases in which because of seemingly slight structural differences [in the claim] *a very great and unobvious difference in conception has been lost sight of* by the Examiner and Board. Properly analyzed, the present facts show strongly that rejection as unpatentable over the four references relied on was unwarranted." [My emphasis.]

---

tempt was made to do so. Instead, the brief switches to the argument that there is nothing to show that 400°F. is a "critical" limit of a temperature range. I therefore regard the board's position on this point as entirely lacking in support by the solicitor.

4. Soldering with metallic solder alloys such as the references show is, moreover, an art totally unrelated to the art of securing with "adhesives." The essential difference is that in soldering the work must be brought up to the temperature at which the solder melts, at least in the surface portion contacted by the solder, else it will not be wetted by the fluid solder and the solder will not bond. Another difference is that chemical fluxes are generally used and, furthermore, soldering is limited to the bonding of metals with metals. The asserted fact that appellants' adhesives may be used on metal does not equate adhesives with solder.

SMITH, Judge (dissenting).

The invention claimed in rejected claim 24 is a "package of solid flexible thermoplastic adhesive in coil form." In defining the properties of the adhesive per se, the claim also calls for the flexible thermoplastic adhesive to be "a normally solid, flexible thermoplastic mixture of at least two ingredients." This mixture must also be "fluid with a viscosity suitably low for adhesive application at temperatures in the range of 250° F. to 400° F."

I do not find these features in Dumont. Dumont, in my opinion, does not show a material which is an "adhesive" within the normal context of the term.

Adhesives are a recognized industrial category. They all have the recognized quality of gripping another material under conditions of use despite such differences as they have in chemical composition.

Dumont's material is a polyamide which is extruded and wound under controlled conditions which produce a structural condition which is asserted to have an orientation of its linear molecules in several directions. This is said to increase the "tenacity" of the product. Webster's Third New International Dictionary defines "tenacity" as, among other things, "tensile strength." I am, therefore, unable to agree with the interpretation given Dumont in the majority opinion. Further, I find no suggestion in Dumont of a flexible thermoplastic adhesive consisting of "at least two ingredients." Likewise, I find no showing in Dumont that the material disclosed therein when heated to the range of 250°F.—400°F., will become fluid and have a sufficiently low viscosity that it is suitable for *adhesive* application within the claimed temperature ranges. Many solids become fluid when subjected to temperatures higher than ambient temperatures. One skilled in this art would know that to be effective as an adhesive, it must possess a sufficiently low viscosity if it is to have adhesive properties in its fluid state. For example,

various waxes, which become fluid at various temperatures, are not "adhesives" in the normal sense of the term. They lack tackiness and readily return to their amorphous state when the temperature is reduced. Normal glues and pressure sensitive adhesives, however, have the required low viscosity and tackiness at ambient temperatures to cause adherence of materials to which they are applied.

Thus, the appealed claim has not only a preamble statement referring to an adhesive product but also defines that product in terms which I think distinguish it over the Dumont disclosure. In this particular I think our decision here should be governed by our opinion in In re DeNapoli, 302 F.2d 768, 770, 49 CCPA 1056, 1059, where the court in reversing an ex parte rejection said:

"The board failed to mention the reference in the preamble of the claim to 'a phonographic translating machine,' leaving the implication that it agreed with the examiner that the preamble 'is merely a statement of the suggested use and therefore lacking in patentable significance.' However, the body of the claim refers to the adjustable mirror as reflecting the image 'into a position to be visible to the transcribing typist.' It seems to us that, taken together, those two recitations impart a limitation to the claim which cannot be ignored in determining patentability. * * "

It seems clear to me that the Dumont reference does not suggest appellants' conception, even though it discloses a roll of plastic which in form may be regarded as more or less similar to appellants' claimed package of adhesive. As I see it, Dumont does not disclose what I think are important limitations in appellants' claim. Thus, since Dumont does not suggest appellants' claimed invention, I would find the rejection over Dumont to be improper.

In determining whether the claimed subject matter as a whole is obvious

**914**

within the meaning of section 103, it is necessary to consider not only structural distinctions recited in the claims but the purpose for which the invention was conceived.

Thus, in In re Osplack, 195 F.2d 921, 924, 39 CCPA 932, 937, the rule is stated that

" * * * the conception of doing a thing, the result of which is new and useful, must be considered along with the actual steps of doing it in considering the presence or absence of patentability. * * * "

Or, as we said in In re Hortman, 264 F.2d 911, 46 CCPA 814:

" * * * [I]n determining the unobviousness of a device, it is proper to consider 'the conception of a new and useful improvement * * * along with the actual means of achieving the improvement.' In re Shaffer, 229 F.2d 476, 480, 43 CCPA 758, 763, and cases there cited. * * * For, though the structure may be but a simple expedient when the novel concept is realized, that structure may not be obvious to the skilled worker in the art where the prior art has failed to suggest the problem or conceive of the idea for its elimination."

Or, as Judge Learned Hand stated in H. K. Regar & Sons v. Scott & Williams, 63 F.2d 229 (2d Cir. 1933):

" * * * When old devices are changed at all, the change may be dictated by a new conception, which it took originality to conceive. Strictly, the old device is not then put to a new use; the new use begets a new device. In such cases it requires but little physical change to make an invention. * * * "

It seems to me, therefore, that the differences which appellants are claiming over the Dumont disclosures are such that the subject matter as a whole would not have been obvious to one of ordinary skill in the packaging of adhesives. I would reverse the decision of the board.